IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
February 10, 2004 Session

## STATE OF TENNESSEE v. CHARLES RICE

**Direct Appeal from the Criminal Court for Shelby County**
**No. 01-00035    Joseph B. Dailey, Judge**

**No. W2002-00471-CCA-R3-DD  - Filed July 9, 2004**

The Defendant, Charles Rice, appeals as of right his conviction for the first degree premeditated murder and first degree felony murder of Emily Branch during the perpetration of a rape. A Shelby County jury found the Defendant guilty of first degree premeditated murder and of first degree felony murder. The trial court merged the convictions into one count of first degree murder. Following a sentencing hearing, the jury found that the proof supported three aggravating circumstances beyond a reasonable doubt: the Defendant had previously been convicted of a violent felony offense, <u>see</u> Tennessee Code Annotated section 39-13-204(i)(2); the murder was especially heinous, atrocious, and cruel, <u>see</u> Tennessee Code Annotated section 39-13-204(i)(5); and the murder was committed during the perpetration of a rape, <u>see</u> Tennessee Code Annotated section 39-13-204(i)(7). The jury further determined that these aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt, and sentenced the Defendant to death. The trial court approved of the sentencing verdict. In this appeal as of right, the Defendant contends that: (1) the evidence was insufficient to support his convictions; (2) the trial court improperly restricted the Defendant's right to cross-examine one of the State's witnesses; (3) the trial court improperly excluded evidence tending to prove the guilt of another; (4) the trial court erred in refusing to permit the Defendant to impeach his own witness; (5) the trial court erred by refusing to permit the Defendant to sit at the same table as his attorney; (6) the trial court's failure to instruct on the lesser offense of facilitation was error; (7) the trial court's failure to instruct the jury as to the definitions of knowingly and recklessly as to the offense of felony murder was error; (8) the indictment failed to set forth a capital offense; (9) Tennessee's death penalty statutory scheme is unconstitutional; (10) the evidence is insufficient to establish the statutory aggravating circumstances found by the jury; (11) the trial court improperly instructed the jury as to the (i)(2) aggravator; and (12) the sentence of death imposed in this case is disproportionate compared to other capital cases. After reviewing the record and applicable law, we conclude that there are no errors of law requiring that the Defendant's conviction or sentence be reversed. Accordingly, we affirm the jury's verdict and imposition of the sentence of death.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which, JOE G. RILEY and JOHN EVERETT WILLIAMS, JJ., joined.

Marty B. McAfee and Stephen Leffler, Memphis, Tennessee, for the appellant, Charles Rice.

Paul G. Summers, Attorney General and Reporter; Michael Moore, Solicitor General; Angele M. Gregory, Assistant Attorney General; William L. Gibbons, District Attorney General, and Amy Weirich and Gerald Harris, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION
## I. Facts

This case involves the murder and rape of thirteen-year-old Emily Branch, which occurred on or near June 18, 2000, in Memphis. Emily Branch was reported missing on June 18, 2000, and her body was discovered on June 25, 2000. After a police investigation, the Defendant was questioned and arrested for her murder. A Shelby County jury found the Defendant guilty of first degree premeditated murder and of first degree felony murder, and sentenced the Defendant to death. The Defendant now appeals.

### A. Facts at Trial

Steven Dwayney Branch, the victim's father, testified that on Sunday, June 18, 2000, which was Father's Day, he was living at 1228 Louisville Street, in Memphis, Tennessee, with his girlfriend and three of her children. Branch testified that, at that time, the victim lived with his sister, Margaret Branch. He said that, on the night of June 17, 2000, the victim, who was thirteen, spent the night at his house. On the morning of June 18, 2000, the victim awoke, dressed, and told her father "Happy Father's Day," while Branch cooked breakfast for all the children. Branch testified that the victim was wearing "a white short-pants overall set with a navy blue shirt, some white socks, her blue and white tennies, and she had a necklace around her neck." He said that the victim left the house that day, and he began to worry when she had not returned by 5:00 p.m. He stated that at 7:00 p.m. he called the police department. Branch testified that the police told him that the victim would probably be back, and they would report her as a "runaway."

Branch testified that his daughter had never runaway before, so that night he began to look for her around the neighborhood. He said that a few people in the neighborhood searched for the victim with him. Branch testified that, a few days after his daughter's disappearance, he spoke with Tony Evans, whom he had known since they were children, and told Evans that he was looking for his daughter. He said that, during the afternoon of Sunday, June 25, 2000, one week from the day that the victim disappeared, Evans came by his home and told him that he had found the victim. Branch testified that he accompanied Evans and Marquette Houston to the place where Evans said that he had found the victim. He said that they all drove in his truck to an Amoco station and parked the truck in the lot of the station. Then, the three men walked on a trail through a wooded area behind an Amoco station, and, after Branch identified the body as belonging to the victim, he called

the police. Branch testified that he could not recognize the victim's facial features because her body had decomposed, but he recognized her clothing, necklace, and shoes as the same that she was wearing on the day that she disappeared. Branch stated that, after he found his daughter's body, he did not move anything and immediately called the police. He said that, when the police arrived, he stayed and talked to them.

Branch testified that the victim's mother was Tracie Anderson, who was married to the Defendant at the time of the victim's disappearance. Branch stated that he and Anderson were never married. He said that the victim never lived with Anderson and the Defendant while they were married. Branch testified that, at the time of his daughter's disappearance, the Defendant lived two streets over from him on Firestone Street. Branch testified that he did not see the Defendant while the victim was missing, and the Defendant never offered to help look for her.

On cross-examination, Branch testified that the victim left the house with three girls at around 11:00 a.m. Branch said that, at the time of his daughter's disappearance, he did not know where Anderson was living. He testified that, when Evans came to his house, Evans told him that the victim was in a field behind the Amoco station located on Chelsea Street. Branch testified that the field behind the Amoco station is a large area that is heavily wooded, and the victim's body was located in a ditch. Branch said that there is a path that starts at the back of the Amoco station and runs along a dry creek bed through the woods. He said that it was just a few minutes walk from the Amoco station to where he found the victim. Branch also testified that he had known the Defendant for thirteen to fifteen years. He said that he was told that the Defendant and Anderson used some kind of "dope," but he had never seen them with it.

Marquette Houston, the victim's friend, testified that he was approximately three years older than the victim, and he had known the victim for a long time "from the neighborhood." Houston said that, during the afternoon of June 18, 2000, he saw the victim on the front porch of her father's house listening to music. He recalled that the victim was listening to a Vanilla Ice CD, and he told her that "nobody . . . listen[s] to Vanilla Ice [any]more." He looked at the Vanilla Ice CD and noticed that it had a scratch on it. Houston testified that this was the last time that he saw the victim alive. He said that, on Sunday, June 25, 2000, he saw Evans come to Branch's house and heard him say that he had found the victim's body behind the Amoco. Houston said that, after he heard this, he got in the truck with Evans and Branch. He explained that Evans led them on the path behind the station, and Houston saw a Vanilla Ice CD lying on the ground in the "pathway area." Houston said that the CD looked like it had been "cracked or something" and had the same scratch on it that he had noticed earlier on the victim's Vanilla Ice CD. Houston recalled that Evans told him not to touch the CD and then showed them the body that Evans had found. He said that Branch then identified the body as the victim from her clothing, but the victim could not be identified by her face because "it was rotten." Houston said that he then ran out of the woods because he was scared, but then stayed to tell the police what he had seen.

On cross-examination, Houston testified that, when Evans drove up on his four-wheeler and told Branch that he found the victim, he had a machete with him and seemed frightened. Houston

testified that Evans led them directly to where the body was hidden in the bushes. He said that, when they came to where the victim's body was located, Evans stuck the machete in the ground and said, "there it is . . . [is] this your daughter?" Houston said that Branch responded, "Yeah, that's my daughter. That's my baby. That's my baby."

Monica Downey testified that, on June 18, 2000, she was living with her mother and her mother's boyfriend, Steven Branch. She said that, on June 18, 2000, she, the victim and five other girls "walked around because that's our normal routine every day. So we [were] walking around, and we [were] on the bridge." Downey testified that, while they were walking on the bridge, the Defendant came by and talked to the victim, but she could not hear what they talked about. She said that the Defendant left, and the girls went to the store and then over to the Defendant's house. Downey testified that, when they first got to the Defendant's house, the victim went inside with him, and she and the other girls waited outside for her to come back. She said that the victim then came out and told her that they all had to leave, so they left the victim on the Defendant's porch and went to the park. Downey said that she left the victim around 4:00 p.m. or 5:00 p.m. On cross-examination, Downey testified that, when she saw the Defendant on the bridge, he was wearing a red baseball cap and a suit that matched it. She explained that it was not unusual for the victim to go to the Defendant's house when the victim's mother lived there. Downey stated that, when she and the other girls left the victim at the Defendant's house, she was unaware that the victim's mother no longer lived there. Downey stated that she never saw the Defendant when they were at the Defendant's house.

Willie Lee Hall, the Defendant's stepfather, testified that, on June 18, 2000, he was living in a house located at 1272 Firestone Street. Hall stated that he knew the victim because she came over to his house "a lot when [the Defendant] and her mother were married." Hall stated that the Defendant and the victim's mother, Tracie Anderson, lived with him for a little over a year after they got married. He said that, on June 18, 2000, the victim came over while the Defendant was there. He said that the Defendant had just come in the house and sat down to watch TV when the victim came inside the front door. Hall said that, when the victim came over, she asked to walk the dog, and Hall told her no because the dog might get her dirty. He said that, when the victim was at the house, he was with her the whole time, and she was never out of his sight. When the victim went back outside, she talked to the girls that she came with and then left with the Defendant, and then the Defendant and the victim walked down the street together toward Bellevue Street. Hall testified that the police came to his home to speak with the Defendant about the victim, who was missing at the time. Hall said that the Defendant told the police where he and the victim parted ways, which was at the intersection of Bellevue Street and Firestone Street.

On cross-examination, Hall testified that, when the victim came to his house, she asked if "daddy" was home because she called the Defendant "daddy." He said that the victim came by his home frequently looking for her mother, and, if her mother was not there, she would want to know where her mother was. Hall said that, when the victim came to the house on June 18, 2000, she was with a group of girls, but, when she came to the door, the girls kept walking to the park. Hall stated that it was about 3:40 p.m. when the Defendant and the victim left together. He also said that, later

that afternoon, the Defendant came back to the house, and he did not change clothes, rather he just went inside and watched TV. He explained that, two or three days after the police first came to Hall's house to ask about the victim, they came back and asked to search the house. Hall granted them permission to search the house, and they took a knife laying on the dining room table. Hall said that the knife had been lying there for the "longest time."

Tony Evans, a convicted felon, testified that he knew the victim because he played football with her father and that he knew Tracie Anderson, the victim's mother. Evans said that, on June 18, 2000, he lived on Firestone Street and saw the victim and a "lot of little girls" walk to Hall's house around 2:00 p.m. or 3:00 p.m. He said that, later that same day, he saw the victim and the Defendant walking away from Hall's house heading westbound on Firestone Street. Evans stated that he thought it surprising that the two were walking together because the victim's mother had recently broken up with the Defendant due to his abuse of her. Evans said that, because this was surprising, he followed the victim and the Defendant. He testified that, after turning off Firestone Street, the two went up another small street together, then headed back on Empire Street, and then headed south on Bellevue Street toward the Amoco station. Evans said that he saw them head past the Amoco station through the pathway on the side of the Amoco station. He testified that, during the entire time, the two were walking, the victim walked in front of the Defendant, and, every now and then, he would say something to the victim and she would turn back toward him and respond. Evans said that, after he saw them walk into the pathway, he returned to his home and finished his yard work.

Evans testified that, the next day, Anderson called him and asked him if he had seen the victim, and he told her that he had seen the victim and the Defendant go into the pathway next to the Amoco station. Evans said that, after speaking with Anderson, he went into the pathway, but he did not find anything because it was hot and the area to be searched was so large. He said that he wanted to find the victim because both of the victim's parents were good friends of his. Evans testified that, on June 25, 2000, he fixed his four-wheeler and went back to the path to search for the victim. He said that, when he went into the woods, he smelled an odor like someone had died, so he determined that the wind was blowing from the northwest and began looking in that direction. Evans explained that, as he was searching, he had to chop through bushes with a machete that he brought with him, and he ended up near several cars. Evans said that he looked in the cars to see if there were any flies coming from any of them, but he did not see any. He explained that he could no longer smell the odor so he went back to his four-wheeler where the odor was strong. Evans said that he walked a short distance from the four-wheeler and "stepped up on the tree and looked down, [and] saw her shoes." He said that he then ran from the woods to Branch's house and told them what he had found. Evans testified that he, Branch, Branch's girlfriend, and Houston drove down to the Amoco station, and he showed them the body. Evans said that they then called the police. Evans testified that, when he saw the victim's body, he recognized it as the victim because of her hair and clothes. He added that he noticed that her shorts were pulled around her ankles.

Evans said that, two days after the victim was missing, he saw Mario Rice, the victim's cousin, and the Defendant walk down to the woods together, and he called Anderson to let her know. Evans testified that the police were called, but they did not get there in time "because it was at

night." Evans said that he then hid underneath a house where Mario Rice and the Defendant were located to try to hear them discuss where they hid the victim, but all he could hear was a discussion about killing Anderson. Evans said that he did this two or three nights in a row, lying there until 4:00 a.m. or 5:00 a.m.

On cross-examination, Evans testified that, while he was suspicious and followed the Defendant and the victim for a few blocks, he stopped following them when they got to the path by the Amoco station because that path leads to Brown Street. He explained that the Defendant had relatives who lived on Brown Street, so he assumed that was where they were headed. Evans said that he told police that, when he saw the Defendant walking with the victim, the Defendant was wearing blue jogging pants and a blue or green baseball hat. Evans admitted that, while he knew the police would be interested in a dead body, he first contacted Branch when he found the body before he called the police. Evans stated that, during the week the victim was missing, the Defendant and Mario Rice would sit in the yard of a house on Alaska Street and watch the pathway, making Evans more suspicious that the victim was back there. Evans denied that he was diagnosed with paranoid schizophrenia and denied that he took medication for this disorder.

Tracie Anderson, the victim's mother, testified that she was married to the Defendant for approximately one year and four months and that they were together for a total of four years beginning in 1998. Anderson testified that she lived with the Defendant in the house on Firestone Street. She stated that she last saw the victim alive on June 4, 2000, at the house where she and the Defendant resided. Anderson testified that, on June 6, 2000, she and the Defendant had an argument, and she left the Defendant to move in with her brother. She said that, prior to leaving the Defendant, the two had discussed her leaving, and the Defendant told her that if she left him, "It will hurt you more than it hurts me." Anderson testified that, after she left the Defendant, she told Steven Branch not to let the victim go to the Defendant's house anymore. On cross-examination, Anderson testified that the Defendant used drugs, specifically "crack" cocaine, and was using "crack" cocaine when she met him. She also said that she had left the Defendant numerous times prior to leaving him on June 6, 2000, but had always returned.

Robin Hulley, a sergeant with the Memphis Police Department, testified that, on June 25, 2000, he was called to the Amoco station where he was led by uniformed police officers to the scene where a dead body had been found. Sergeant Hulley testified that, to the side of the Amoco station, there is a pathway that can be seen from the parking lot, and there is a big grassy field at the end of the pathway. The sergeant said that the victim's body was found on the right side of the field. He stated that the distance from the entrance of the pathway to the victim's body was approximately half a city block. He said that, walking on the pathway, he noticed a broken Vanilla Ice CD and thought it was strange because there was no other debris on the path. The sergeant said that the area where he observed the body was heavily wooded and appeared to be in a dry creek bed. Sergeant Hulley stated that, when he saw the body, it was lying face up, and the victim's short overalls and panties were pulled completely to the victim's ankles.

On cross-examination, the sergeant testified that he worked with another officer, A.J. Kent,

on this crime scene and that the sergeant was responsible for taking the photographs and writing the report, while Officer Kent was responsible for sketching the crime scene and tagging the physical evidence. The sergeant testified that the victim's body was not obvious from the path and could not be seen from the grassy field. He said that the body was not covered by any brush. The sergeant said that the only blood at the crime scene was around the victim's body. He also said that the CD was not wet or muddy and appeared to be clean.

Michael Jeffrey Clark, an officer with the Memphis Police Department, testified that, on June 25, 2000, he was assigned to investigate the victim's murder. He said that he went to the Amoco station and was briefed by uniformed policemen about finding the victim's body. The officer said that he was then led to the scene where the body was found. He testified that the distance from the entrance of the path at the Amoco station to the body was the same as the "length of a football field." Officer Clark said that he had to walk "right up to the edge of the creek bank and look down to be able to see" where the body was lying. He said that the victim's body was in a face up position with the short overalls pulled down to the victim's ankles, and there was a pair of panties tangled up with the overalls.

Officer Clark testified that, during his investigation, he interviewed Tony Evans, whom Clark then considered a suspect. The officer gathered information from Evans and was able to corroborate the information. After interviewing Evans, the officer interviewed Marquette Houston verbally and then took a written statement from him. He said that he also interviewed Tracie Anderson, Steven Branch, and Mario Rice and then went to the Defendant's home, where he interviewed Willie Lee Hall and Delores Hall. The officer testified that he interviewed the Defendant at around 2:00 a.m. on June 26, 2000, at the police department.

The officer testified that, after the Defendant signed and dated a Miranda rights form, he told the Defendant that other witnesses had seen the Defendant entering the woods with the victim near the Amoco station, where she was found dead. Officer Clark said that the Defendant denied going into the woods with the victim and denied knowing anything about her disappearance or her murder. The officer said that he then told the Defendant that it appeared to him that the victim had been raped, and he asked the Defendant if he would be willing to submit to a DNA[1] test so that the police could compare his DNA with the DNA found in the victim. The officer said that he questioned the Defendant again about the events of June 18, 2000, and the Defendant told him that he had sex with the victim inside the kitchen of his parents' home, and he explained, "I had sex for about a minute with her." Officer Clark said that the Defendant said that he had seen the victim and she asked him for money and to walk his dog, and the Defendant asked her to walk to the store so he could get some change. Officer Clark stated that the Defendant said that, when he arrived at the store, he told the victim that he did not have any money, and they parted ways. The officer then said that the Defendant changed his story and told him that they went to his house after the victim asked him for money and that led to the sexual act in the kitchen, and then she left his house and he did not see her again. The officer said that they confronted the Defendant with the Defendant's stepfather's story

---

[1]Deoxyribonucleic acid.

that he saw the Defendant leave the house with the victim, and the Defendant replied that he entered the woods with the victim, but denied any wrongdoing.

Officer Clark testified that he and another officer decided to put the Defendant in the Shelby County jail, and the Defendant asked for protective custody because he said that he had received some threats from the family members in the neighborhood. The officer said that he responded, "Do you mean the family members of the girl you killed?" and the Defendant said, "Yes, sir."

On cross-examination, the officer testified that the path looked like it had been mowed recently or like cars had used it to gain access to the back of the woods, and the CD that he found was lying on top of the grass. Officer Clark said that Evans told police that he suspected the Defendant, and the Defendant was detained approximately fifteen minutes after the body was found. He said that, later, when he was back at the police station interviewing the suspects, he had the Defendant in one interview room, Mario Rice in another, and Evans in a third room. The officer testified that, during the course of that evening, he interviewed Evans first, then Houston, Anderson, Steven Branch, and Mario Rice. He then left and interviewed Willie Lee Hall, Delores Hall, and then returned to the station and began interviewing the Defendant at around 2:00 a.m. The officer stated that he did not notice any tire marks in the field when he began his investigation.

James L. Fitzpatrick, a sergeant with the Memphis Police Department, testified that he was called to assist in the investigation of this case on June 25, 2000. He said that he went to the crime scene at around 5:00 p.m. and viewed the victim's body, which was in advanced stages of decomposition. He explained that the victim's upper torso had decayed substantially, but the lower legs and the arms were still intact. He said that the legs had the hue of polished light-colored wood, while the facial portion appeared to have mummified and had taken on the appearance of dark leather. He confirmed that the victim's clothes were around her ankles.

Sergeant Fitzpatrick testified that, after advising the Defendant of his rights, he took the Defendant's statement at around 2:00 p.m. on June 26, 2000, with the assistance of Sergeant Earnestine Davison. The statement was taken by a transcriptionist in a question and answer format. The sergeant read the statement to the jury. In that statement, the Defendant said that he knew the victim because he had married her mother and that the last time he saw the victim was between 4:30 p.m and 5:30 p.m behind the Amoco station. The Defendant said that he and the victim walked through the path on the way to the field and "that's when my . . . [Mario Rice] killed [the victim]." The Defendant explained that he and Mario Rice planned to take the victim to this location so that Mario Rice could kill her. The Defendant said that Mario Rice was going to kill the victim because he was "tired of seeing [the Defendant] going through things [he] was going through with [the victim's] mother." The Defendant said that the initial plan was to have Anderson accompany the Defendant to the field where Mario Rice would kill her, but Anderson was not around. The Defendant said that he encountered the victim between Bellevue Street and Smith Street with her friends and told her to meet him later at his stepfather's house on Firestone Street because she wanted to walk his dog and she wanted ten dollars. He stated that, while she was at the house, "Me and her had sex in the kitchen. It lasted about sixty seconds," and stated that the victim told him that

"she [knew] that her stuff was [better] than her mother's." He stated that "this was the first time we had sex," and he did not reach climax.

In his statement, the Defendant also said that, after his sexual encounter with the victim, he and the victim left the house and went to the Amoco station on Chelsea Street under the guise that the Defendant would "get some change and give her $10." However, the Defendant said that they never went to the Amoco station, and the Defendant told the victim that he did not have any money. The Defendant said that the victim then followed him into the woods and, while in the woods, the Defendant and the victim were greeted by Mario Rice. The Defendant then said:

> And that's when we said, "F*** this b****; let's kill this b****." I told Emily about an apple tree and a fenced-in area, so she went in there, and that's when my nephew started to stab her. He stabbed her in the head first and in the throat numerous times and in the chest area numerous times. That's when I ran, and my nephew, Mario Rice, ran behind me. . . . Then I went to another friend's house on Montgomery. Then I went to another friend's house on Ayers, and that's where Mario [Rice] and I met up again. We started drinking, and we stayed together until about 10:00 p.m. And then he went home and I went home.

The Defendant explained that Mario Rice and the victim were cousins, and he provided more details about the actual murder, saying:

> She was facing him, and he was facing her, and there were a lot of words. He was talking to her. I really don't know exactly what he was saying. Then he pulled the knife from out of his left back pocket, and then he stabbed her in the head. She went down on one or two knees, and that's when he stabbed her in the throat a bunch of times, and she fell back on her back. She was moving her hands like she was trying to tell Mario [Rice] to stop. She pulled – and she had pulled her clothes down before the first stabbing, and I guess she thought she was getting ready to be raped by what Mario [Rice] was saying because it made me wonder why was she taking her clothes down. As I think about it, I think she must of fell back because of the way Mario [Rice] was stabbing her in the neck and chest.

The Defendant said that Mario Rice used a "kitchen knife, not a butcher knife" during the murder. When further questioned as to his and Mario Rice's plans, the Defendant admitted that the plan was to lure the victim's mother to the field and to "take care" of her. He said that he "was going to take care of the mother, and Mario [Rice] was going to take care of anybody else." He continued, "I was probably going to jump on the mother. That probably wasn't all I would have done to her."

The sergeant testified that, on June 27, 2000, he took the Defendant back to the crime scene to do a "walk through" video of the series of events leading to the victim's death. The Defendant told the sergeant that he got the victim to accompany him to the secluded part of the field by telling her that there was an apple tree back there. The Defendant then led officers directly to the spot

where the victim's body was discovered. On cross-examination, Sergeant Fitzpatrick admitted that, in every statement given by the Defendant, he denied killing the victim.

Ernestine Davison, an officer with the Memphis Police Department, testified that she talked with a few witnesses at the crime scene and then interviewed the Defendant at around 2:00 a.m. on June 26, 2000. She said that she advised the Defendant of his rights and that he seemed alert and willing to cooperate. Officer Davison said that she remembered the Defendant telling her three different stories during the interview period. She also testified that, when asked, "Who is threatening you, the family of the girl that you killed?" the Defendant responded, "Yes, sir." On cross examination, the officer testified that the Defendant consistently maintained that he did not kill the victim.

Dr. Cynthia Gardner, a medical examiner with the Shelby County Medical Examiner's Office, testified that she examined the victim's body. Dr. Gardner testified that she visited the crime scene, where she observed the body in its discovered position. She stated that the victim was "lying on her back in a field" and noted that the victim's shorts were pulled down around her ankles. She explained that the body was in a state of advanced decomposition, "in many areas . . . the soft tissues were completely gone and only the skeleton remain[ed]."

Dr. Gardner explained that she later performed an external examination of the victim's body with the clothing intact. She noticed that the rate of decomposition was occurring at different rates in different areas of the body and explained that "differential decomposition is associated with areas of injuries." She continued:

> If there's a breach in the skin surface somewhere or even if there is a large bruise, which is just a collection of blood, both of those factors are very attractive to the infection bacteria that promote decomposition. So when you see a body where there w[ere] areas of decomposition which has occurred at a faster rate, it's more advanced decomposition in a very specific area. That indicates that there was probably injury in that area.

Dr. Gardner stated that she observed areas of advanced decomposition "[i]n the head, the neck, the chest, the upper back, and in the groin area" and, because of the advanced state of decomposition in the vaginal areas, she opined that there was some sort of trauma or injury to the area prior to death. Additionally, as part of the external examination, Dr. Gardner noted that the victim had what appeared to be stab wounds in the right lower quadrant of the torso and on the left wrist and explained that the wounds to the victim's wrist were defensive injuries. She further confirmed that the wounds were consistent with those inflicted by a kitchen knife. The doctor stated that, an examination of the victim's clothing revealed tears consistent with those produced by a knife. Specifically, she said that an examination of the victim's shirt indicated ten total defects consistent with those produced by a knife: one in the right lower quadrant; four in the anterior left chest; one on the right chest; three on the arm; and one on the back. Dr. Gardner also observed injury to the neck area, indicating that a sharp instrument went all the way through the soft tissues from the skin

all the way down to the bone in the back. The doctor explained that the windpipe and esophagus are located directly in this neck region and would "most definitely have been severed" for that injury to have been produced. She said that another point of sharp trauma was observed to the back of the skull where there was a puncture wound; however, this wound did not penetrate through the skull. From her examination, Dr. Gardner determined that there were ten stab wounds on the shirt, three to the neck, one to the back of the head, and two to the left wrist, for a total of sixteen stab wounds. Dr. Gardner concluded that the victim's death was the result of multiple stab wounds. She added that, due to the extent of the decomposition, she was unable to obtain any swabs for DNA testing. She further stated that the victim's body was identified as that of Emily Branch through her dental x-rays.

Dr. Steven Symes, a forensic anthropologist with the medical examiner's office, assisted Dr. Gardner in her examination of the victim's body. Dr. Symes testified that he examined the bones of the victim's upper body and found four instances of "sharp trauma to bone," three of which were located in the neck and one of which was on the back of the skull. The doctor testified that these wounds were inflicted from the front of the victim, penetrated through her and impacted her spinal cord. He said that the knife used had a single-edged blade, the same as some kitchen knives.

The Defendant called Michael Patton, who testified that, in June of 2000, he stayed at Delores Rice's house located at 1039 Alaska Street at least once a week, but usually two or three times a week. Patton testified about the hole located behind the house that led to the crawl space. He said that nothing was kept in the crawl space except a ladder, which was kept "right there at the front entrance so we can reach in and get it." Patton testified that the crawl space was in the back of the house under the childrens' bedrooms. He also said that there were dogs in the neighboring yards that would bark if someone was in the backyard. He testified that a person inside the house could hear if someone was hiding in the crawl space.

Lee Bearden testified that, on June 18, 2000, he was watching football at 1:00 p.m. when Mario Rice, Donnie Tate, and R.L. Branch came to his house. He said that they played dominoes together until about 3:00 p.m. On cross-examination, Bearden admitted that he was convicted of arson in 1997 and of aggravated assault in 1992.

R.L. Branch testified that he is Mario Rice's father and that, on June 18, 2000, he picked up Mario Rice around 1:30 p.m. at Mario Rice's house on Alaska Street and brought him to Bearden's house. He said that, at the time, he was at Bearden's house with Bearden, Mario Rice, and Donnie Tate. R.L. Branch testified that the four men drank beer and played dominos until 3:00 p.m., and then went to Save-A-Lot, where they met Larry Rice and Carolyn Rice at around 4:00 p.m. He said that, after they left the store, they went to Tate's house and ate dinner. R.L. Branch stated that, after dinner, at around 8:00 p.m., he took Mario Rice to meet his girlfriend. On cross-examination, R.L. Branch testified that Steven Branch is his brother and the victim was his niece. He said that Mario Rice and the victim were close and played together like cousins. He said that there was no way that Mario Rice stabbed the victim that day because Mario Rice was with him until 8:00 p.m.

Donald Tate testified that he is Mario Rice's cousin and confirmed R.L. Branch's testimony regarding the events of June 18, 2000. Larry Rice testified and confirmed that he met Mario Rice at the store around 4:30 p.m. or 5:00 p.m. on June 18, 2000.

Roy Herron testified that, at 5:00 p.m., the Defendant came to his home where the two men watched the U.S. Open golf tournament. Herron said that, when the Defendant came over, there was no blood on his clothes or shoes, and he did not have a weapon on him. He said that the Defendant stayed until the golf tournament was over, which was about 7:00 p.m. Julie Scobey testified that she is employed with WMC-TV in Memphis and, on June 18, 2000, the U.S. Open golf tournament was played on their station between 12:30 p.m. and 6:59 p.m.

Dr. Joseph Angelillo, a clinical psychologist, completed an evaluation of the Defendant and determined, as a result of testing, that the Defendant's full-scale I.Q. is 79.

Rosyln Johnson testified that she works for Correctional Alternatives Incorporated as a presentence investigator, and she prepared Tony Evans' presentence report. She said that, as part of her presentence investigation, Evans gave her written information that he was diagnosed as having paranoid schizophrenia. Johnson stated that Evans provided her an appointment sheet stating when his next appointment was and also provided her with his medicine bottles.

Stephanie Fitch testified that she gave a statement to police in which she said that she saw the victim at the store at around 5:00 p.m. with some other girls and that she saw her later walking on the railroad tracks alone. Fitch testified that this statement was not true.

Based upon this evidence and the arguments of counsel, the jury found the Defendant guilty of first degree premeditated murder and first degree felony murder. The trial court merged the two counts into one judgment for murder in the first degree. See State v. Davidson, 121 S.W.3d 600, 609 n.4 (Tenn. 2003) (emphasizing that if a jury returns a verdict of guilt on more than one theory of first degree murder, the trial court may merge the convictions and impose a single judgment of conviction).

## B. Facts at Penalty Phase

The following evidence was presented during the penalty phase of the trial. Bob Fleming, a criminal court clerk, testified that the Defendant pled guilty to aggravated assault on January 2, 1991.

The victim's father, Steven Branch, testified that the victim was thirteen years old at the time of her murder. Steven Branch explained that the victim lived with his sister, but the victim had been staying at his house over the summer. He stated that the victim wanted to be a model when she grew up, and he was saving money to send her to modeling school. Steven Branch said that he and the victim enjoyed spending time together, and, since her death, he has felt "real bad." He often spends nights "sit[ting] . . . in my living room, just watch[ing] her picture. . . ."

The defense called Gloria Shettles, a mitigation investigator with Inquisitor, Incorporated. She testified that she investigated the Defendant's background and learned that one of the Defendant's sisters died on April 17, 1979, from lupus, his father died on July 11, 1985, from cancer, his brother died on June 25, 1986, as a result of a drowning accident, and another of his sisters died on January 19, 2001, from colon cancer. The Defendant was twenty years old when his father died.

Shettles testified that she obtained the Defendant's school records which indicated that he went to school in Memphis and that he was held back in the third grade. The records indicated that, in the fifth grade, the Defendant was only reading at a third-grade level and failed spelling. The Defendant's conduct grade in the sixth grade was unsatisfactory and he was reading at a 2.8 level. Shettles testified that, in the seventh grade, the Defendant earned all F's with the exception of music, in which he earned a D. The Defendant did not receive any grades in eighth grade due to nonattendance, and he dropped out of school after the eighth grade.

Shettles testified that, while investigating the Defendant's background, she learned that the Defendant was a witness to a crime in his neighborhood when he was sixteen years old and testified for the State at the suspects' trial. The transcript of the trial showed that the Defendant testified that he went into a grocery store to purchase cigarettes and beer and, after making his purchase, he left the store and walked to the corner. He testified that he then heard gunshots coming from the store and walked back to the store where, looking through the door, he observed a man holding one of the store clerks by the shirt collar with a pistol "up side his head." The Defendant said that, when he saw this, he left, but later identified the perpetrators of that crime in a police line-up. The perpetrators of this crime were later convicted of first degree murder and sentenced to death. Shettles added that the Defendant was thirty-five-years old at the time of the victim's death.

Joyce Rice, the Defendant's sister, testified that her brother was the youngest of six children and only three of those children are still alive. Joyce Rice confirmed that her brother witnessed the crime about which he testified, and she believed that her brother saw the men being killed. She also explained that one of their brothers was murdered over gambling by being hit in the back of the head and thrown into a swimming pool. Joyce Rice testified that she cared about the Defendant, who worked in construction, but conceded that the Defendant had been using "crack" cocaine for about two years and, as a result, his life started going downhill.

Dr. Joseph Angelillo testified again during the penalty phase. He said that he met with the Defendant several times, during which he conducted various intellectual and personality tests on the Defendant. In addition to this testing, Dr. Angelillo reviewed the Defendant's school records and his social history. The doctor testified that the Defendant had "a significant amount of loss in his life," because he lost his sisters, a brother, and father. Additionally, Dr. Angelillo opined that the fact that the Defendant witnessed the murder at the grocery store when he was sixteen years old was also a significant event. Other significant factors considered by Dr. Angelillo included the Defendant's apparent inability to retain a job for any length of time, the Defendant's use of "crack" cocaine, marijuana and alcohol, his experimentation with LSD and his past suicide attempt. The

-13-

doctor explained that drug usage remains an important factor because of "one's erratic behavior, moods, unpredictability, change in personality, change in impulse control, and things like that with the repeated use of that particular substance."

Dr. Angelillo stated that the intellectual tests showed that the Defendant's intellect "was in the upper end of what is termed the borderline range. That was the full scale IQ . . . 79." The doctor said that the Defendant suffers from a delusional and paranoid disorder, but these disorders are factored with his history of drug and alcohol abuse. He also stated that the Defendant has a "dependent personality . . . [a]s well as passive-aggressive . . . personality traits." The doctor testified that the fact that the Defendant suffers from a delusional disorder is relevant in that "[i]t would impair [his] ability to construe, to manage to make sense out of day-to-day situations." Dr. Angelillo admitted that, during the testing, he found the Defendant to be "very angry . . . somewhat sullen, mistrustful, and generally self-indulgent." Additionally, a computer-generated test indicated that the Defendant has a disregard for authoritative figures, tends to deny responsibility, and blames others for his problems.

Corporal Barbara Williams, an employee with the Shelby County Sheriff's Department, testified that there were no incidents of violence reported involving the Defendant since he has been confined at the Shelby County Jail. She said that the Defendant attempted suicide on July 5, 2000.

At the close of the proof, the trial court instructed the jury on the following statutory aggravating circumstances:

> The defendant was previously convicted of one or more felonies, other than the present charge, the statutory elements of which involve the use of violence to the person. The state is relying upon the crime of aggravated assault which is a felony involving the use of violence to the person.
>
> The murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death; and the defendant knowingly committed, solicited, directed, or aided, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit rape.
> . . . .

See generally Tenn. Code Ann. § 39-13-204(i)(2), (i)(5), (i)(7).

The court then instructed the jury that it should consider mitigating circumstances, stating:

> Tennessee law provides that in arriving at the punishment, the jury shall consider, as previously indicated, any mitigating circumstances raised by the evidence which shall include but are not limited to the following: (1) Any testimony that the defendant was diagnosed as suffering from significant psychological disturbance. (2) Any testimony that the capacity of the defendant to appreciate the wrongfulness of

-14-

the defendant's conduct or to conform the defendant's conduct to the requirement of the law may have been substantially impaired as a result of intoxication which was insufficient to establish a defense to the crime but which may have substantially affected the defendant's judgment. (3) Any testimony that the capacity of the defendant to appreciate the wrongfulness of his act or his conduct or to conform the defendant's conduct to the requirements of the law may have been substantially impaired as a result of the defendant's level of intellectual functioning - i.e. 8th grade education/ I.Q. of 79 - which was insufficient to establish a defense to the crime but which may have substantially affected the defendant's judgment. (4) Any testimony regarding the defendant's level of intellectual functioning. (5) Any testimony that the defendant suffers from a personality disorder. (6) Any testimony of the defendant's history of emotional trauma. (7) Any testimony of the defendant's past cooperation with authorities. (8) Any testimony of the defendant's positive record of incarceration. (9) Any testimony of the defendant's potential for rehabilitation while incarcerated. (10) Any testimony of the defendant's potential for non-violent behavior while incarcerated. (11) Any testimony of the defendant's age in relation to a sentence of life in prison for life without parole. (12) Any testimony that he was a loving child. (13) Any testimony that he had loving relationships with family members. (14) Any testimony that he suffered significant loss of loved ones. (15) Any testimony showing a broken home at an early age. (16) Any testimony of a history of substance abuse. (17) Any testimony showing a lack of formal education. (18) Any testimony showing he has family members that will provide him with love and support while in prison. (19) Any testimony that the defendant was not the only participant in this offense, even though this fact would be insufficient to establish a defense to the crime. (20) Any other mitigating factor which is raised by the evidence produced by either the prosecution or the defense at either the guilt or sentencing hearing; that is, you shall consider any aspect of the defendant's character or record, or any aspect of the circumstances of the offense favorable to the defendant which is supported by the evidence.

Based upon the evidence presented at the penalty phase of the trial and the jury instructions, the jury found that the State proved three aggravating circumstances: (1) that the Defendant was previously convicted of one or more violent felonies other than the present charge; (2) that the murder was especially heinous, atrocious, or cruel; and (3) that the murder was committed while the Defendant had a substantial role in committing or attempting to commit rape. The jury further found that the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt. In accordance with their verdicts, the jury sentenced the Defendant to death for the victim's murder.

The Defendant now appeals contending that: (1) the evidence was insufficient to support his conviction; (2) the trial court improperly restricted the Defendant's right to cross-examine one of the State's witnesses; (3) the trial court improperly excluded evidence tending to prove the guilt of another; (4) the trial court erred in refusing to permit the Defendant to impeach his own witness; (5)

-15-

the trial court erred by refusing to permit the Defendant to sit at the same table as his attorney; (6) the trial court's failure to instruct on the lesser offense of facilitation was error; (7) the trial court's failure to instruct the jury as to the definitions of knowingly and recklessly as to the offense of felony murder was error; (8) the indictment failed to set forth a capital offense; (9) Tennessee's death penalty statutory scheme is unconstitutional; (10) the evidence is insufficient to establish the statutory aggravating circumstances found by the jury; (11) the trial court improperly instructed the jury as to the (i)(2) aggravator; and (12) the sentence of death imposed in this case is disproportionate compared to other capital cases.

## II.  Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his conviction because: (1) there was insufficient evidence of his identity as the perpetrator of the crime for which he was convicted; and (2) the evidence was insufficient to prove that the victim was raped.  When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003).  This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence.  State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence.  State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).  Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence.  State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956).  Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact.  Liakas, 286 S.W.2d at 859.  This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence.  Davidson, 121 S.W.3d at 614; State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992).  Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict.  Evans, 838 S.W.2d at 191.  The standard of appellate review is the same whether the conviction is based upon direct or circumstantial evidence.  State v. Reid, 91 S.W.3d 247, 277 (Tenn. 2002).

### A.  Identity of the Perpetrator

The Defendant contends that insufficient evidence exists to prove his identity as the perpetrator of this crime.  First he asserts that he was convicted based primarily upon the testimony of Tony Evans and upon his own statements to police.  The Defendant asserts that Evans is not a credible witness because he is a convicted felon who was a suspect in this crime and who lied under

oath. The Defendant further asserts that he gave a false confession to police evidenced by the fact that part of the confession, that Mario Rice murdered the victim, was proven not true by multiple witnesses at trial. The State responds that both the direct and circumstantial proof establish the Defendant as the offender in this case. Specifically, the State contends that Evans' credibility is a matter of discretion for the jury and should not be second-guessed by this Court on appeal.

The Defendant was convicted of premeditated first degree murder and felony murder. Premeditated first degree murder is the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (1997 & Supp. 2000). Premeditation is "an act done after the exercise of reflection and judgment. 'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Tenn. Code Ann. § 39-13-202(d). Felony murder is "a killing of another committed in the perpetration of or attempt to perpetrate any . . . rape." Tenn. Code Ann. § 39-13-202(a)(2).

The identity of the perpetrator is an essential element of any crime. See State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975). Sufficient proof of the perpetrator's identity may be proven through circumstantial evidence alone. See State v. Darnell 905 S.W.2d 953, 961 (Tenn. Crim. App. 1995). A conviction may be based entirely on circumstantial evidence where the facts are "'so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone.'" Reid, 91 S.W.3d at 277 (quoting State v. Smith, 868 S.W.2d 561, 569 (Tenn. 1993)). The jury decides the weight to be given to circumstantial evidence and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." Marable v. State, 203 Tenn. 440, 313 S.W.2d 451, 457 (1958) (citations omitted).

The Defendant does not appeal whether the proof was sufficient to show that the murder was premeditated, rather he contends that the evidence was insufficient to prove his identity as the murderer because Evans was not a credible witness and because the Defendant's "statements given to the police after several hours of questioning were not true." The record in this case reflects that, on the day of the victim's disappearance, the victim went to the Defendant's father's house with some of her girlfriends. She told her girlfriends to leave, and she stayed at the house with the Defendant. The Defendant admitted having sex with the victim in his father's home. The victim and the Defendant left the house together and were seen entering the woods next to the Amoco station. The Defendant admitted "luring" the victim into the woods so that Mario Rice could kill her. He said that the victim inexplicably pulled down her shorts and panties before Mario Rice stabbed her multiple times. Several witnesses testified that Mario Rice was with them at the time of the murder. One witness testified that the Defendant came to his house at 5:00 p.m. on the evening of the murder. The Defendant took police into the woods and led them to the location where the victim's body was found, and he was able to re-enact how the murder took place and able to describe how the victim was stabbed. Considering the proof in the record in the light most favorable to the State, we conclude that the proof points the finger of guilt at the Defendant and the Defendant alone and that a rational jury could have found the essential elements of premeditated first degree

murder beyond a reasonable doubt. As stated above, this Court does not resolve questions involving the credibility of witnesses or the weight and value to be given the evidence. See State v. Nash, 104 S.W.3d 495, 500 (Tenn. 2003). Those are matters entrusted to the trier of fact, not the appellate courts. Id. Therefore, the Defendant's challenge to the sufficiency of the evidence is without merit.

As further support for this holding, we note that, even were the jury to accept the facts as the Defendant presented them, that he lured the victim into the woods knowing that Mario Rice intended to kill the victim and then watched as Mario Rice killed the victim, the evidence is still sufficient to sustain the Defendant's first degree murder conviction. The Defendant is criminally responsible for an offense by the conduct of another where: "Acting with intent to promote or assist the commission of the offense . . . the person solicits, directs, aids or attempts to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402(2) (1997). Therefore, because the Defendant aided in the commission of this crime, he is guilty in the same degree as the principal who committed the crime. See State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999). Accordingly, the evidence is sufficient on this additional ground to find the Defendant guilty of premeditated first degree murder and of felony murder.

## B. Killing in Commission of Rape

The Defendant next contends that the evidence presented was insufficient to prove that the killing was committed during the perpetration of a rape, so as to support his conviction for felony murder. The Defendant asserts that the State's proof regarding the rape is based purely on circumstantial facts, which are insufficient to support a felony murder conviction. As stated above, a conviction may be based entirely on circumstantial evidence where the facts are "'so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone.'" Reid, 91 S.W.3d at 277 (quoting State v. Smith, 868 S.W.2d 561, 569 (Tenn. 1993)). While single facts, considered alone, may count for little weight, when all of the facts and circumstances are taken together, they can point the finger of guilt at the Defendant beyond a reasonable doubt. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Moreover, "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions . . . for the jury." Marable, 203 Tenn. 440, 313 S.W.2d at 457; see State v. Gregory, 862 S.W.2d 574, 577 (Tenn. Crim. App. 1993).

In order to obtain a conviction for felony murder in this case, the State was required to prove: (1) a killing of another; (2) committed during the perpetration of a rape. Tenn. Code Ann. § 39-13-202(2). Rape is:

[U]nlawful sexual penetration of a victim by the defendant . . . accompanied by any of the following circumstances:

(1) Force or coercion is used to accomplish the act;

-18-

(2) The sexual penetration is accomplished without the consent of the victim and the defendant knows or has reason to know at the time of the penetration that the victim did not consent . . . .

Tenn. Code Ann. § 39-13-503(a) (1997). It is the long-standing tenet of Tennessee law that to sustain a conviction for felony murder, the killing must have been done in pursuance of the felony and must not merely be collateral to the unlawful act. State v. Severs, 759 S.W.2d 935, 938 (Tenn. Crim. App. 1988). In other words, for a murder to be done in "perpetration of" the felony, "the killing must have had an intimate relation and close connection with the felony . . . and not be separate, distinct, and independent from it." Farmer v. State, 201 Tenn. 107, 269 S.W.2d 879, 883 (1956) (citations omitted).

The Defendant contends that the proof that he allegedly raped the victim is based on circumstantial facts and, "while indicative of the possibility that the victim was raped, is not sufficient to justify any rational trier of fact in finding beyond a reasonable doubt that the victim was raped." As stated above, our standard of appellate review is the same whether the conviction is based upon direct or circumstantial evidence. Reid, 91 S.W.3d at 277. Based upon similar facts, the Tennessee Supreme Court, in State v. Ronnie Dunn, 1993 WL 339919, No. 03S01-9211-CR-00104, at *3 (Tenn. 1993) (designated not for publication),[2] held that there was insufficient evidence to support a felony murder conviction because the evidence did not prove beyond all reasonable doubt that the victim was raped.

In Dunn, the evidence established that the badly decomposed body of a sixteen year-old female victim was found in a creek bed. The last time the victim had been seen alive was approximately two months before her body was discovered. Dunn, 1993 WL 339919, at *3. The day before she became missing, the victim was seen kissing the defendant, and, for the remainder of that evening and into the next morning she, the defendant, and another friend drove around drinking beer and ingesting prescription drugs. Id. at *1. The friend was eventually dropped off, and the victim remained with the defendant. Id. When the victim was found, she was naked below the waist. Id. at *2. Bruises were found around the neck. Id. There were no signs of trauma to the genital region of the body nor was it possible to test for the presence of sperm. Id. Based upon that evidence and other circumstantial evidence, the jury convicted the defendant of felony murder after concluding that the murder occurred during the commission or attempt to commit a rape. Id. at *3. The Tennessee Supreme Court concluded that the evidence was insufficient to support the conclusion beyond a reasonable doubt that the murder occurred during the commission of or in an attempt to commit a rape. Id. The Court concluded that although there was circumstantial evidence

---

[2]The citation of cases designated "Not For Publication" is mandated by Rule 4 of the Tennessee Rules of Supreme Court. That Rule states that "Unless explicitly designated 'Not For Publication,' all opinions of the Tennessee Supreme Court shall be published in the official reporter. Tenn. R. S. Ct. 4(2). The Rule goes on to state that "Unless designated 'Not For Citation,' 'DCRO' or 'DNP' pursuant to subsection (F) of this Rule, unpublished opinions for all other purposes shall be considered persuasive authority." Tenn. R. S. Ct. 4 (H)(1). Dunn is not designated "Not For Citation" but is designated "Not For Publication." As such, we conclude that, according to Rule 4 (H)(1), should be considered persuasive authority by this Court.

-19-

of sexual activity, this evidence was not sufficient to establish that the defendant raped or attempted to rape the victim. Id. In reaching its conclusion, the Court noted that, although the removal of the victim's clothing is indicative of sexual activity, "[i]t is just as plausible to conclude that the victim and the defendant engaged in consensual sexual activity. . . ." Id. at *3.

In State v. Shepherd, 902 S.W.2d 895, 899 (Tenn. 1995), the Tennessee Supreme Court distinguished the facts of Shepherd from the facts in Dunn. In Shepherd, the defendant, who was twenty-five, was riding around with five teenagers, three boys and two girls, one evening. Id. at 898. The Defendant parked his car on a bridge over the Tellico River, after which one of the boys began to quarrel with one of the girls, and the two left to walk to a store. Id. The Defendant then drove himself, the victim, and two other boys to Tellico Beach, but, before reaching the beach, the defendant turned onto a road and approached the victim about having sex with him. Id. The victim refused and the defendant wrestled with her until everyone got out of the car. Id. One of the boys calmed the victim down, and they all got back into the car and drove further to a clearing in the woods. Id. The defendant stopped the car again and held a gun to the victim's head and asked her again to have sex with him, and she refused. Id. The defendant then asked the two boys, who had to relieve themselves, to go down the road a bit so that he could talk to the victim and calm her down. Id. The boys heard sounds of a scuffle and the victim say "you son of a bitch." Id. When they returned to the car, the defendant said the victim had run off and they began to search for her. Id.

The victim was later found in a shallow grave in the defendant's parents' backyard. Id. at 899. The victim's upper torso was clad with a shirt and bra, and a jacket was wrapped around her head. Id. The victim was nude from the waist down. Id. The defendant gave a statement to police in which he said that he did not kill the victim, rather she hit her head on a rock. Id. at 900. The Defendant admitted that he buried the victim at his parents' house. Id. The defendant said that her clothes were missing because he decided to burn her clothes, but changed his mind. Id. A doctor testified that there was no sign of trauma to the body and no foreign object inside it. Id. He also testified that he found no evidence of sperm but indicated that, over the period of time since death, any sperm could have degenerated. Id. at 901. The Supreme Court held that this evidence was sufficient to support the defendant's conviction of felony murder committed during the perpetration of or attempted perpetration of a rape. Id. at 902. The Court distinguished its holding in Dunn stating, "Dunn is distinguishable from this case by the fact that the victim in Dunn had been engaging in voluntary sexual activities and ingestion of alcohol and drugs with the defendant at the time of her death," implying, therefore, that it could not be conclusively ruled out that the victim had consensual sex with the defendant in Dunn. Id. at 902.

We hold that the case currently before us is also distinguishable from Dunn in that it is not "just as plausible to conclude that the victim and the [d]efendant engaged in consensual sexual activity . . . ." The evidence in the case under submission establishes that, when the victim's body was found, her underwear and shorts were down around her ankles, exposing her genital area. The medical examiner testified that the advanced decomposition of the victim's vaginal area is likely the result of bruising or trauma to that region. The Defendant denied having sex with the victim, who was his step-daughter, until investigators told him that they suspected that she was raped and they

might be able to conduct a DNA test and asked him to submit a DNA sample, to which the Defendant responded that he had consensual sex with the thirteen-year-old victim earlier that day in his parents' kitchen. However, the Defendant's stepfather testified that the Defendant was not alone with the victim in the kitchen or in the house that day and that he could hear the two in the house together until they left. After telling police that he lured the victim into the woods for Mario Rice to kill her, he said that she removed her clothing and must have thought she was going to be raped, which he found unusual since Mario Rice and the victim were related. The record contains sufficient proof for a rational trier of fact to conclude, beyond a reasonable doubt, that the victim was killed during the perpetration or attempt to perpetrate a rape. Accordingly, this claim is without merit.

### III. Right to Cross-Examine for Bias

The Defendant next contends that the trial court improperly prohibited him from adequately cross-examining Tony Evans. The Defendant asserts that on direct examination the State elicited the fact that Evans pled guilty to felony possession of cocaine with intent to sell three months before the Defendant's trial. The Defendant's counsel attempted to question Evans on the sentence that he received for this conviction "because it appeared that Mr. Evans had obtained a great reduction in his sentence." The Defendant's counsel asserted that the sentencing range for Evans' conviction was eight to twelve years, and he only received a six-year sentence for his conviction and was released to serve his sentence on community corrections. The Defendant asserted before the trial court that Evans received a "sweetheart deal" and that he should therefore be allowed to question Evans about whether there was a deal because, if there were a deal giving Evans a reduced sentence in exchange for his testimony, that would show Evans' bias. The trial court denied defense counsel's request, finding:

> [T]here are many, many reasons for cases to be settled in different ways for reasons that may have nothing at all to do with this particular case. I don't know anything at all about the facts of that other case, but of course there could have been search and seizure problems. This could have been a house occupied by fifteen people and associating the drugs and the guns to this individual may have been a problem for the state–they may have had a whole host of problems. These witnesses that they had may have been suspect–they may have had credibility problems. . . . You ma[d]e the statement . . . that he . . . got some sort of sweetheart deal and you intend to go forward and present that to the jury . . ., and the fact of the matter is, . . . that unless you can tie in . . . the disposition of that case in Division VII with this case, I'm not going to let you do that. I'm going to require you to follow the law which is you may ask this witness, "Are you the same John Doe that was convicted on such and such a date in indictment such-and-such of this offense, and received this sentence." Period, end of discussion. The law does not allow you to look behind that . . . .
>
> . . . .
>
> Now, it's improper for you to suggest that because he's on community

corrections he got a sweetheart deal from the state. Maybe you should call Judge Bennet to the stand and ask him why he put him on community corrections. You're making some very large l[ea]ps here for which there is not basis.

Now, you can ask him what the law allows, which is what I just detailed. And if you have any specific information that would suggest that that settlement over there was a direct result of a deal in exchange for his testimony in here, obviously you could ask that too. But without any information to connect the two, you can't go into that. . . .

Defense counsel then requested to make an offer of proof, which the trial court denied, absent proof of some nexus between the deal and the testimony. The trial court allowed defense counsel to ask only if Evans pled guilty and what sentence Evans received and prohibited counsel from questioning Evans with regard to the manner in which his sentence was being served. The Defendant asserts that this restriction on cross-examination magnified the error in that "[n]ot only was the defense prohibited from showing that the witness never spent one day in jail; instead, the jury was allowed to infer that the witness was going to spend six years in jail for his crime." The Defendant contends that the trial court's limitation on his cross-examination of Evans' bias was reversible error.

The right to explore or examine witnesses for bias is a fundamental right. State v. Sayles, 49 S.W.3d 275, 279 (Tenn. 2001) (citing Davis v. State, 186 Tenn. 545, 212 S.W.2d 374, 375 (1948)). The exercise of this right is "'controlled by the trial judge and his discretion will not ordinarily be disturbed.'" Id. (quoting Davis, 212 S.W.2d at 375). Therefore, absent an abuse of discretion, we will uphold the trial court's decision. Id. A defendant has the right to examine witnesses to impeach their credibility or to establish that the witnesses are biased. Id. This includes the right to examine a witness regarding any promises of leniency, promises to help the witness, or any other favorable treatment offered to the witness. Id. (citing State v. Smith, 893 S.W.2d 908, 924 (Tenn. 1994); State v. Spurlock, 874 S.W.2d 602, 617 (Tenn. Crim. App. 1993)). Although the trial court retains discretion regarding the exercise of the right to examine witnesses for bias, an abuse of that discretion may violate a defendant's right to confrontation under the Sixth Amendment of the United States Constitution and Article I, Section 9, of the Tennessee Constitution. Id. (citing Smith, 893 S.W.2d at 924; State v. Black, 815 S.W.2d 166 ,177 (Tenn. 1991)). To show a violation of the right, the defendant must show that "'he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, thereby exposing to the jury the facts from which jurors could appropriately draw inferences relating to the reliability of the witnesses.'" Black, 815 S.W.2d at 177 (quoting Deleware v. Van Arsdall, 475 U.S. 673, 680 (1986)). Revealing the true nature of the witness's motivation for testifying is a proper and important function of cross-examination. Van Ardsall, 475 U.S. at 678-79. "It is the essence of a fair trial that reasonable latitude be given the cross-examiner, even though he is unable to state to the court what fact a reasonable cross-examination might develop." Alford v. United States, 282 U.S. 687, 692 (1931).

The facts of the case currently before us are similar to the facts faced by the court in Sayles. In Sayles, one of the State's witnesses refused to testify against the defendant, stating that he had

been threatened by the defendant. Sayles, 49 S.W.3d at 277. The trial court allowed the State to interview the witness, and the witness returned to the courtroom and testified against the defendant. Id. The State asked the witness if he was promised anything in exchange for his testimony and the witness said "no." Id. at 278. Immediately after the witness testified, in a jury-out proceeding, the State requested that the witness' bond in another unrelated case be reduced to $1,000 and that the charge against him be reduced from aggravated robbery to robbery. Id. The trial court granted the State's request, and the defendant asked to cross-examine the witness again with regard to bias based upon this apparent deal between the witness and the State. Id. The trial court denied the defendant's request. Id. On appeal, this Court reversed the conviction and remanded the case for a new trial holding that "the defendant was clearly entitled to explore what, if anything, the prosecuting attorney told [the witness] prior to his testifying, and whether there had been an agreement between the state and [the witness]." Id. at 279 (quoting State v. Sayles, W1998-00425-SC-R11-CD, 1999 WL 628854, at *5 (Tenn. Crim. App., at Jackson, Aug. 19, 1999)). The State appealed, and the Tennessee Supreme Court affirmed this Court, holding that "the trial court's failure to allow such an examination was error." Id. at 280. The Court stated that the defendant's "right to a fair trial entitled him to probe witnesses under oath. The trial court, therefore, erred in refusing to allow [the defendant's] counsel to delve deeper into the reasons for [the witness's] turnaround." Id.

In the case under submission, like in Sayles, the testimony sought to be adduced pertained to the bias or prejudice of one of the State's witnesses, Evans. Accordingly, as the State concedes on appeal, defense counsel should have been allowed to examine Evans to determine whether there was a connection between Evans' allegedly reduced sentence and his testimony because such a connection could create the inference that Evans was biased or unreliable in the eyes of the jury. The trial court's failure to allow such cross-examination was error.

Having decided that the trial court erred by not allowing defense counsel to cross-examine Evans about his sentence, we must now decide whether that error was reversible. "Once a constitutional error has been established, as in this case, the burden is upon the State to prove that the constitutional right violation is harmless beyond a reasonable doubt." Momon v. State, 18 S.W.3d 152, 167 (Tenn. 1999) (citations omitted). A violation of the right to confrontation may be deemed harmless "if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." Sayles, 49 S.W.3d at 280 (quoting Van Arsdall, 475 U.S. at 681) (citing State v. Reid, 882 S.W.2d 423, 429 (Tenn. Crim. App. 1994)). In determining whether the constitutionally improper denial of a defendant's opportunity to impeach a witness is harmless:

> The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the

overall strength of the prosecution's case.

Van Arsdall, 475 U.S. at 684; see also State v. Howell, 868 S.W.2d 238, 253 (Tenn. 1993).

After reviewing the record in its entirety, we conclude that the trial court's improper restriction on the Defendant's cross-examination of Evans was harmless beyond a reasonable doubt. This case is substantially different from Sayles, where the Court found that the error was reversible error, because Evans was not the only witness testifying to the incriminating facts against the Defendant and because most of his testimony was corroborated by other witnesses, including the Defendant himself. Evans testified that he saw the victim and the Defendant leave the Defendant's parents' house on the day that the victim disappeared. He said that he saw them walk toward the Amoco station and into the woods. He testified that he overheard conversations between the Defendant and Mario Rice during which the two discussed killing the victim's mother. Evans also testified that he found the body in the woods. This testimony was corroborated by the Defendant's stepfather, who said that the Defendant and the victim left his house together on the day of the victim's disappearance. The Defendant, in his statement to police, said that he left his parents' house with the victim and led her to the woods by the Amoco station, where Mario Rice planned to kill the victim. The Defendant said that, when he came to the woods, Mario Rice stabbed the victim multiple times, and the Defendant took police to the location where they had found the victim's body. The Defendant also admitted having conversations with Mario Rice about killing the Defendant's wife. Accordingly, because Evans' testimony was corroborated by other witnesses and because of the overall strength of the prosecution's case, we conclude that the trial court's error was harmless beyond a reasonable doubt.

## IV. Exclusion of Evidence Showing Guilt of Tony Evans

The Defendant contends that the trial court improperly restricted his cross-examination of Evans in another respect. He asserts that he requested permission to "put on evidence" that Evans "had a reputation for violence in the community" and "engaged in sexual relationships with 'very young' women in their teenage years." The trial court found that the evidence regarding Evans' alleged violent character and his alleged sexual relationships were irrelevant absent proof to link Evans with this crime.

In Tennessee, admissibility of evidence is within the sound discretion of the trial judge. State v. Saylor, 117 S.W.3d 239, 247 (Tenn. 2003). The determination of whether proffered evidence is relevant in accordance with Tennessee Rule of Evidence 402 is left to the sound discretion of the trial judge. State v. Kennedy, 7 S.W.3d 58, 68 (Tenn. Crim. App. 1999) (citing State v. Forbes, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995)); State v. Burlison, 868 S.W.2d 713, 720-21 (Tenn. Crim. App. 1993)). In making these decisions, the trial court must consider the questions of fact that the jury will have to consider in determining the accused's guilt as well as other evidence that has been introduced during the course of the trial. State v. Williamson, 919 S.W.2d 69, 78 (Tenn. Crim. App. 1995). We will only disturb an evidentiary ruling on appeal when it appears that the trial judge arbitrarily exercised his discretion. State v. Baker, 785 S.W.2d 132, 134 (Tenn. Crim. App. 1989).

-24-

Initial questions of admissibility of evidence are governed by Tennessee Rules of Evidence 401 and 403. These rules require that the trial court must first determine whether the proffered evidence is relevant. Pursuant to Rule 401, evidence is deemed relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence." See Forbes, 918 S.W.2d at 449. In other words, "evidence is relevant if it helps the trier of fact resolve an issue of fact." Neil P. Cohen, et al., *Tennessee Law of Evidence* § 4.01[4], at 4-8 (4th ed. 2000). Relevant evidence may still be inadmissible if its admittance is prohibited by one of the other rules of evidence.

The Defendant contends that the aforementioned testimony is admissible because he is entitled to present evidence tending to implicate other persons in the crime for which he is charged. It is true that a defendant is generally entitled to attempt to prove by competent evidence that there was another individual who had a motive to commit the very same crime for which he is charged. Powers v. State, 101 S.W.3d 383, 394 (Tenn. 2003) (citing Sawyers v. State, 83 Tenn. (15 Lea) 694, 695 (1885)); State v. Spurlock, 874 S.W.2d 602, 612 (Tenn. Crim. App. 1993). However, the evidence that a defendant seeks to elicit must be competent and must conform to the rules governing the admissibility of evidence. State v. McAlister, 751 S.W.2d 436, 439 (Tenn. Crim. App. 1987); see also Powers, 101 S.W.3d at 395. The defendant is entitled to present evidence implicating another in the crime if the evidence is relevant and it is not unfairly prejudicial. See Powers, 101 S.W.3d at 395.

To be relevant under Tennessee Rule of Evidence 401, evidence must tend "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." In a criminal case, evidence that a third party had the motive and opportunity to commit the offense certainly would be relevant. Even if the evidence meets the test of relevance, however, Tennessee Rule of Evidence 403 may still justify exclusion of such evidence. Under Rule 403, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." As stated above, generally, when we review a claim that calls into question a trial court's exclusion of evidence on the grounds of irrelevance, we will not disturb the decision of the trial court absent an abuse of discretion. See State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978).

The Tennessee Supreme Court's decision in Powers provides guidance to us in deciding the case under submission. In Powers, the Defendant sought to introduce evidence that other, third parties had the motive and opportunity to kill the victim. Powers, 101 S.W.3d at 394. The Court decided that this type of evidence was admissible if allowed pursuant to the Tennessee Rules of Evidence. Id. at 395. The court then held that the trial court did not abuse its discretion when it found that the evidence that the defendant in Powers sought to admit was irrelevant pursuant to Tennessee Rule of Evidence 401, stating, "The evidence produced in Powers' offer of proof would not assist in proving that [the third party] had a motive to kill [the victim]." Id.

The Defendant in the case under submission attempted to introduce evidence that Evans, a witness, had a reputation for violence and engaged in consensual sexual activities with minor girls.

The trial court ruled that this evidence was not relevant. We hold that the trial court did not abuse its discretion in excluding this evidence. Evans' alleged propensity for violence is not relevant to establish any motive or opportunity or means to kill the victim. Similarly, Evans' alleged sexual activities is not relevant to show any likelihood that Evans murdered the victim. However, even if this evidence satisfies the relatively low threshold of Tennessee Rule of Evidence 401, its probative value would be substantially outweighed by its prejudicial effect and by the risk of confusing and misleading the jury. Therefore, we conclude that the trial court did not err in refusing to admit this evidence.

## V. Impeachment of Defense Witness

The Defendant contends that the trial court erred when it refused to allow him to introduce extrinsic evidence to impeach Stephanie Fitch, a witness called by the defense. The Defendant states he called Fitch, expecting her to establish that she saw the victim around 5:00 p.m. at the New Chicago Store on the day that the victim disappeared. However, Fitch testified at trial that she last saw the victim on the morning of her disappearance. The Defendant then asked Fitch about a statement that she gave to police that she saw the victim at 5:00 p.m., and Fitch denied ever making that statement to police. The Defendant then asked to call Detective Jacobs to testify about taking Fitch's statement and the substance of that statement. The trial court denied the request, and the Defendant contends that this ruling was in error.

The admissibility, relevancy, and competency of evidence are matters entrusted to the sound discretion of the trial court. With that principle in mind, we review the trial court's evidentiary rulings for abuse of discretion. See State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997); State v. Gray, 960 S.W.2d 598, 606 (Tenn. Crim. App. 1997).

The credibility of a witness may be attacked by any party, including the party calling the witness. Tenn. R. Evid. 607; Cohen, *supra* § 607[2] at 6-55. Prior inconsistent statements may be used to impeach the credibility of a witness. Tenn. R. Evid. 613; Cohen, *supra*, § 613[2][a] at 6-131. The prior inconsistent statement is "admissible to impeach but is not admissible as substantive evidence unless some other evidence rule would admit it." Cohen, *supra*, § 6.13[2][b] at 6-131. Tennessee Rule of Evidence 613 permits counsel to introduce extrinsic proof of a prior inconsistent statement if certain circumstances exist. The proper foundation for admission of extrinsic evidence of a prior inconsistent statement is to: (1) provide the witness an opportunity to admit, deny, or explain the prior inconsistent statement; (2) refresh the witness' memory; and (3) allow the witness to respond intelligently to the impeachment attempt. See State v. Martin, 964 S.W.2d 564, 567-68 (Tenn. 1998); State v. Gregory Dunnorm, No. E2001-00566-CCA-R3-CD, 2002 WL 1298770, at * 9 (Tenn. Crim. App., at Knoxville, June 12, 2002), *no perm. app. filed*; State v. Orlando Crayton, No. W2000-00213-CCA-R3-CD, 2001 WL 720612, at *5 (Tenn. Crim. App., at Jackson, June 27, 2001), *no perm. app. filed*. The admissibility of the extrinsic evidence is contingent upon whether the witness admits or denies having made the prior inconsistent statement, Martin, 964 S.W.2d at 567, and may be used to impeach the credibility of a witness who denies or cannot remember having made a prior statement. State v. Jones, 15 S.W.3d 880, 891 (Tenn. Crim. App. 1999). The extrinsic proof may be the written or recorded prior statement itself or the testimony of another witness as to

the content of the prior oral statement. Cohen, *supra*, § 613[5][a] at 6-139.

In the case under submission, the Defendant called Fitch expecting that she would testify that she saw the victim at 5:00 p.m. on the day that the victim disappeared. When testifying, Fitch stated that the last time that she saw the victim was the morning of the day that the victim disappeared. The Defendant asked Fitch about a prior inconsistent statement that she made to Detective Jacobs that she saw the victim at 5:00 p.m. Fitch denied ever making this statement. The Defendant then sought to call Detective Jacobs to testify about the prior inconsistent statement, and the trial court denied this request. The State concedes the error and we agree. Thus, we hold that the trial court abused its discretion when it denied the admission of Detective Jacobs' testimony as extrinsic evidence of Fitch's prior inconsistent statement. The Defendant laid the proper foundation for the admission of the extrinsic evidence, and the failure to admit this testimony was in violation of the evidentiary rules.

"A violation of an evidentiary rule may not mandate reversal if the error 'was more probably than not harmless.'" Martin, 964 S.W.2d at 568 (quoting United States v. Barrett, 703 F.2d 1076, 1081-82 (9th Cir. 1983)). This Court has said that "harmless error analysis applies to virtually all trial errors except the denial of counsel and the partiality of the adjudicator." Wilson v. State, 724 S.W.2d 766, 769 (Tenn. Crim. App. 1986). Pursuant to Tennessee Rule of Criminal Procedure 52(a), "[n]o judgment of conviction shall be reversed on appeal except for errors which affirmatively appear to have affected the result of the trial on its merits."

The State contends that this error was harmless. While we have decided that the trial court abused its discretion, we conclude that this error was more probably than not harmless. First, we note that the jury would have been instructed that the admission of Fitch's prior inconsistent statement could be considered as proof of her lack of credibility, but not as substantive evidence. Because Fitch was a defense witness, her lack of credibility does not affect the State's case, but further damages the Defendant's defense. Additionally, in light of the Defendant's statements to police and the weight of the other evidence presented at trial, we conclude that the trial court's error was harmless.

## VI. Defendant's Exclusion from Defense Table

The Defendant contends that the trial court erred when it refused to allow him to sit at the same table as his trial counsel and required him to sit on a bench located immediately behind his trial counsel's table. Before jury selection, the Defendant's trial counsel requested that the Defendant sit at the same table with him so the two could "consult with" each other. The trial court denied this request and stated that counsel was sitting twelve to eighteen inches in front of the Defendant, who was seated on the first row bench behind counsel's table, so communication between the two was not hindered. The trial court informed the Defendant's trial counsel that he could sit next to the Defendant on the bench, but that the Defendant could not sit at the table. The Defendant contends that the trial court's ruling violates his Due Process rights, does not afford him a fair trial, and removes the presumption of innocence.

We first note that the trial court's ruling comported with local rules governing procedure in the trial court. Rule 8.05 of the Rules of Shelby County Criminal Court provides that "[w]here space is available and with permission of the Court, the defendant may sit at counsel table with his or her attorney." Thus, according to the rules of the court in which the Defendant was tried, the trial court is not required to allow a defendant to sit at his counsel's table. Rather, the trial court may, in its discretion, give a defendant permission to sit at the table. Although we have decided that the trial court complied with local rules of procedure, we must still decide whether the trial court's ruling violated the Defendant's constitutional rights.

The Defendant argues that ordering a defendant to sit behind his trial counsel is similar to forcing a defendant to wear prison garb and shackles in the courtroom in that both erode the presumption of innocence. The Defendant is correct that we have held that forcing a defendant to wear prison garb and shackles in the courtroom does, in fact, erode the presumption of innocence, see State v. Thompson, 832 S.W.2d 577, 580 (Tenn. Crim. App. 1991), but we cannot agree with his assertion that the seating arrangement at his trial had the same result.

This issue is one of first impression in this State, and, accordingly, we look to the persuasive authority of other jurisdictions to reach our conclusion. "In general, the course and conduct of trial proceedings rests within the sound discretion of the trial court." State v. King, 40 S.W.3d 442, 449 (Tenn. 2001) (citing State v. Cazes, 875 S.W.2d 253, 260 (Tenn. 1994)). This Court has stated, "The question of whether a person 'should be permitted to sit at the state's counsel table is a matter which addresses itself to the sound discretion of the trial court.'" State v. James Phillip Hunter, No. 01C01-9404-CR-00154, 1996 WL 10085, at *11 (Tenn. Crim. App., at Nashville, Jan. 11, 1996), *perm. app. denied* (Tenn. 1996) (quoting State v. Henry Eugene Hodges, No. 01C01-9212-CR-00382, 1995 WL 301443, at *20 (Tenn. Crim. App., at Nashville, May 18, 1995), *no perm. app. filed*). Similarly, we conclude that whether a defendant should be permitted to sit at the defense counsel table is a matter which is within the sound discretion of the trial court. See generally Webster v. State, 680 S.W.2d 906, 908 (Ark. 1984); Commonwealth v. Moore, 393 N.E.2d 904, 907 (Mass. 1979); Shaver v. State, 306 S.W.2d 128, 130 (Tex. Crim. App. 1957); State v. Johnson, 462 P.2d 933, 935 (Wash. 1969). Further, a defendant must suffer some prejudice as a result of being seated behind counsel or he has no ground for complaint. See Webster, 680 S.W.2d at 908.

The highest court in Massachusetts has held that the seating of a defendant elsewhere other than at counsel table does not "dilute the presumption of innocence." See Commonweath v. Lockley, 408 N.E.2d 834, 840 (Mass. 1980) (citation omitted). Similarly, the First Circuit, when addressing the issue, distinguished placing a defendant in the front row of seats from ordering a defendant to sit in "prisoner's row," stating, sitting "in the front row of the spectator's area of the courtroom [is] hardly a place calculated to strip an accused of his presumption of innocence in the eyes of a jury." United States v. Turkette, 656 F.2d 5, 9-10 (1st Cir. 1981). The same court later addressed whether seating a defendant in the front row violated a defendant's Sixth Amendment right to effective assistance of counsel by hampering his ability to communicate with his attorney. United States v. Sorrentino, 726 F.2d 876, 887 (1st Cir. 1984). In Sorrentino, the court held that "absent reasons of security or . . . practicality, a defendant has the right to be seated at the same table as his attorney, however," the defendant must show some prejudice, such as evidence that the seating

arrangement prevented or unduly hindered communication between him and his counsel, to be entitled to relief.  Id.

We conclude that the trial court did not abuse its discretion by ordering the Defendant to sit in the front row behind defense counsel's table.  The trial court's order, which was in compliance with local rules of procedure, did not impair the Defendant's presumption of innocence and did not impact his communication with his counsel.  Further, the Defendant has failed to demonstrate how he was prejudiced by the seating arrangements, which would be required for him to prevail on this issue.  Accordingly, we conclude that this issue is without merit.

## VII.  Instruction on Lesser Included Offense of Facilitation

The Defendant contends that the trial court erred by not instructing the jury on the lesser included offense of facilitation.  At the close of proof, the Defendant's trial counsel orally requested that the trial court instruct the jury on all the lesser included offenses of first degree premeditated murder and first degree felony murder, including facilitation.  The trial court denied the Defendant's request finding that there was no factual basis to support a charge of facilitation.  The State contends that the Defendant has waived this issue by failing to comply with Tennessee Code Annotated section 40-18-110 (1997 & Supp. 2002).[3]

The trial in this case began on January 7, 2002.  In 2001, the Tennessee Legislature amended section 40-18-110 to provide that an instruction as to a lesser included offense is waived unless the defendant requests in writing, prior to the trial court's charge to the jury, that such an instruction be provided to the jury.  Tenn. Code Ann. § 40-18-110(c).  This amendment to Tennessee Code Annotated section 40-18-110 governs all trials on or after January 1, 2002.  2001 Tenn. Pub. Acts

---

[3]Tennessee Code Annotated section 40-18-110(a)-(c) states:

**Charge as to lesser included offenses – Written request.** (a) When requested by a party in writing prior to the trial judge's instructions to the jury in a criminal case, the trial judge shall instruct the jury as to the law of each offense specifically identified in the request that is a lesser included offense of the offense charged in the indictment or presentment.  However, the trial judge shall not instruct the jury as to any such offense unless the judge determines that the record contains any evidence which reasonable minds could accept as to the lesser included offense.  In making this determination, the trial judge shall view the evidence liberally in the light most favorable to the existence of the lesser included offense without making any judgment on the credibility of such evidence.  The trial judge shall also determine whether the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser included offense.

(b) In the absence of a written request from a party specifically identifying the particular lesser included offense or offenses on which a jury instruction is sought, the trial judge may charge the jury on any lesser included offense or offenses, but no party shall be entitled to any such charge.

(c) Notwithstanding any other provision of law to the contrary, when the defendant fails to request the instruction of a lesser included offense as required by this section, such instruction is waived.  Absent a written request, the failure of a trial judge to instruct the jury on any lesser included offense may not be presented as a ground for relief either in a motion for a new trial or on appeal.

338, § 2. Because the Defendant did not request an instruction on the lesser included offense of facilitation in writing prior to the trial court's charge to the jury, the Defendant has not presented a ground upon which relief may be granted. Tenn. Code Ann. § 40-18-110(c). See State v. Nesha Newsome, No. W2002-01306-CCA-R3-CD, 2003 WL 23100597, at *6 (Tenn. Crim. App., at Jackson, Dec. 30, 2003), *perm. app. denied* (Tenn. May 24, 2004); State v. Rashe Moore, No. W2002-01195-CCA-R3-CD, 2003 WL 22888881, at *8 (Tenn. Crim. App., at Jackson, Dec. 3, 2003), *perm. app. denied* (Tenn. Apr. 5, 2004); State v. Terrance G. Motley, W2002-02079-CCA-R3-CD, 2003 WL 22718191, at *6 (Tenn. Crim. App., at Jackson, Nov. 14, 2003), *perm. app. denied* (Tenn. Mar. 22, 2004); State v. Brian Larice Cureton, No. M2002-00835-CCA-R3-CD, 2003 WL 22303084, at *11 (Tenn. Crim. App., at Nashville, Oct. 8, 2003), *perm. app. denied* (Tenn. Mar. 22, 2004). Therefore this issue is without merit.

Even if the legislature had not amended Tennessee Code Annotated section 40-18-110(c), the trial court's failure to charge the jury on facilitation would not be reversible error. The question of whether a given offense should be submitted to the jury as a lesser included offense is a mixed question of law and fact. State v. Rush, 50 S.W.3d 424, 427 (Tenn. 2001) (citing State v. Smiley, 38 S.W.3d 521 (Tenn. 2001)). The standard of review for mixed questions of law and fact is de novo with no presumption of correctness. Id.; see State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). The trial court has a duty "to give a complete charge of the law applicable to the facts of a case." Harbison, 704 S.W.2d at 319; see Tenn. R. Crim. P. 30.

"In applying the lesser-included offense doctrine, three questions arise: (1) whether an offense is a lesser-included offense; (2) whether the evidence supports a lesser-included offense instruction; and (3) whether an instructional error is harmless." State v. Allen, 69 S.W.3d 181, 187 (Tenn. 2002). Pursuant to part (c)(1) of the analysis set forth by the Tennessee Supreme Court in Burns, 6 S.W.3d at 466-67, "An offense is a lesser-included offense if: . . . (c) it consists of: (1) facilitation of the offense charged or of an offense that otherwise meets the definition of lesser-included offense in part (a)[4] or (b)[5] . . . ." In accordance with this analysis, facilitation of premeditated murder is a lesser included offense of premeditated murder and facilitation of felony murder is a lesser included offense of felony murder. See State v. Ely, 48 S.W.3d 710, 720 (Tenn. 2001). The Tennessee Supreme Court has acknowledged that facilitation is not an immediately lesser offense. Rather, it is a separate and distinct theory of liability from that of a principal offender or someone who is criminally responsible for the conduct of another. See State v. Locke, 90 S.W.3d 663, 672 (Tenn. 2002).

The Tennessee Supreme Court has adopted a two-step process for determining if the evidence justifies a jury instruction on a lesser included offense. The trial court must first determine whether

[4]"all of its statutory elements are included within the statutory elements of the offense charged . . ."

[5]"it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing (1) a different mental state indicating a lesser kind of culpability; and/or (2) a less serious harm or risk of harm to the same person, property or public interest . . ."

there is evidence, viewed liberally in a light most favorable to the existence of the lesser included offense without judging its credibility, that "reasonable minds" could accept to establish the lesser included offense. Burns, 6 S.W.3d at 649; Ely, 48 S.W.3d at 722. Next, the court must determine if the evidence, viewed in this same light, is "legally sufficient" to support a conviction for the lesser included offense. Burns, 6 S.W.3d at 649. "The guiding principle is that if there is evidence in the record from which the jury could conclude that a lesser-included offense was committed, there must be an instruction for the lesser offense." Motley, 2003 WL 22718191, at *6. The evidence, not the theories of the parties, determines whether an instruction on a lesser included offense should be given. Allen, 69 S.W3d at 188.

Tennessee Code Annotated section 39-11-403(a) defines "facilitation" as follows:

A person is criminally responsible for the facilitation of a felony if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony.

A person is criminally responsible for the conduct of another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Tenn. Code Ann. § 39-11-402(2).

An instruction on facilitation addresses the Defendant's role in the crime as a facilitator and not as a party to the offense. See Locke, 90 S.W.3d at 672-73. In order for reasonable minds to find the Defendant guilty of facilitation of first degree premeditated murder, the jury would have to conclude that the Defendant, although neither acting with the intent to promote premeditated murder nor benefitting in the results, provided Mario Rice with substantial assistance knowing that Mario Rice intended to commit premeditated murder. See Tenn. Code Ann. § 39-11-403(a). Similarly, the jury would have to conclude that the Defendant, although not acting with the intent to promote rape nor benefit in the results, provided Mario Rice with substantial assistance knowing that Mario Rice intended to commit rape.

We conclude that the trial court did not err when it refused to instruct the jury on facilitation to commit premeditated murder or facilitation to commit felony murder. The State presented evidence showing that the Defendant left the Defendant's father's house with the victim and was seen walking with the victim toward the path adjacent to the Amoco station. The State also presented the Defendant's statements in which he stated: (1) that he and Mario Rice planned to take the victim to the location where she was later found dead to kill the victim; (2) that he walked into the woods behind the Amoco station with the victim; (3) that they met Mario Rice in those woods and Mario Rice and the victim began talking; (4) that the victim inexplicably removed her clothes when talking to Mario Rice; (5) that Mario Rice stabbed the victim multiple times; and (6) that he ran when Mario Rice stabbed the victim. The Defendant offered testimony from multiple witnesses that Mario Rice was with them at the time of the murder, and, therefore, could not have committed the murder. The Defendant also offered evidence that the Defendant's IQ was 79 and that Evans was

not a credible witness. Further, the Defendant offered an alibi witness, who testified that the Defendant was with him at the time when the murder occurred watching a golf tournament on TV.

This evidence is susceptible to the following interpretations: (1) that the Defendant acted alone, lured the victim to the secluded area, raped her, and then murdered her; (2) that the Defendant acted alone and murdered the victim, but did not rape her; (3) that the Defendant and his nephew Mario Rice planned the victim's murder and that the Defendant directed the victim to the location where Mario Rice laid in wait and murdered her; (4) that neither the Defendant nor Mario Rice had any involvement in the victim's murder. Under none of these interpretations of the evidence do the Defendant's actions qualify as those of a facilitator. Therefore, the trial court did not err in refusing to instruct the jury on facilitation.

Further, even were we to conclude otherwise, any instructional error by the trial court was harmless beyond a reasonable doubt.

> When a lesser included offense instruction is improperly omitted, . . . the harmless error inquiry is the same as for other constitutional errors: whether it appears beyond a reasonable doubt that the error did not affect the outcome of the trial. In making this determination, a reviewing court should conduct a through examination of the record, including the evidence presented at trial, the defendant's theory of defense, and the verdict returned by the jury.

Allen, 69 S.W.3d at 191 (citations omitted). The Tennessee Supreme Court held that "a failure to instruct the jury on lesser-included offenses will merit reversal unless the State proves beyond a reasonable doubt that the outcome of the trial was not affected." Richmond, 90 S.W.3d at 661. In deciding whether the failure to instruct the jury is harmless, the reviewing court must determine whether a reasonable jury would have convicted the defendant of the lesser included offense instead of the charged offense. Id. at 662. That is, the reviewing court must determine whether it appears beyond a reasonable doubt that the trial court's failure to instruct on the lesser included offense did not affect the outcome of the trial. Allen, 69 S.W.3d at 191. In making this determination, "a reviewing court should conduct a thorough examination of the record, including the evidence presented at trial, the defendant's theory of defense, and the verdict returned by the jury." Id.

The State's evidence established that the Defendant and his nephew, Mario Rice, had planned to murder either the victim or the victim's mother. The Defendant was observed walking into a secluded area behind the Amoco station with the victim. The victim's decomposing corpse was found seven days later in a ditch behind the gas station. When confronted with the possibility that the victim was raped and the possibility of DNA testing, the Defendant admitted to having sexual intercourse with the victim in the Defendant's stepfather's home on the day of her disappearance. The Defendant's stepfather testified that he was present and could hear the Defendant and the victim when they were in his home, and the two did not engage in sexual activity. The Defendant initially denied any involvement or any knowledge of the victim's murder, but later admitted that he lured the victim into the woods where Mario Rice was waiting to kill her. The Defendant told police that Mario Rice stabbed the victim numerous times. The Defendant directed law enforcement officers

to the location where the victim's body was discovered. The Defendant established an alibi for Mario Rice and for himself at the time that the murder occurred.

The jury's verdict reflects that it rejected the Defendant's alibi presented by the Defendant and accepted the evidence presented by the State. The jury found the Defendant guilty of first degree murder rather than second degree murder or any other lesser included offenses. See State v. Rhynuia Lamont Barnes, No. M2001-00631-CCA-R3-CD, 2002 WL 1358717, *12 (Tenn. Crim. App., at Nashville, Jun. 24, 2002), *perm. app. denied* (Tenn. Dec. 2, 2002). Considering the evidence at trial, the theory of the defense, and the verdict rendered by the jury, we conclude that any failure to instruct on facilitation to commit first degree premeditated murder and facilitation to commit first degree felony murder was harmless beyond a reasonable doubt and did not affect the outcome of the trial.

### VIII. Failure to Instruct as to Knowingly and Recklessly

The Defendant contends that the trial court improperly instructed the jury on the essential elements of murder in the perpetration of a rape. The Defendant asserts that the trial court instructed the jury that an element of this crime was that the Defendant acted "intentionally, knowingly or recklessly," but then only defined "intentionally" and failed to define "knowingly or recklessly." A criminal defendant has a constitutional right to a correct and complete charge of the law. State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990), *superceded by statute as stated in* State v. Reid, 91 S.W.3d 247 (Tenn. 2002). When reviewing jury instructions on appeal to determine whether they are erroneous, this Court should review the charge in its entirety and read it as a whole. State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997). A jury instruction is to be considered prejudicially erroneous only if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law. Id.

The State correctly contends that the Defendant waived this issue by failing to object to the jury instruction at trial and by failing to raise the issue in his motion for new trial. See Tenn. R. App. P. 3; Tenn. R. Crim. P. 30(a)(b); State v. Cravens, 764 S.W.2d 754, 756 (Tenn. 1989). The trial court gave the following instruction on felony murder:

> Any person who commits first-degree murder is guilty of a crime. For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt the existence of the following essential elements: that the defendant unlawfully killed the alleged victim; and that the killing was committed in the perpetration of or the attempt to perpetrate the alleged Rape; that is, that the killing was closely connected to the alleged Rape and was not a separate, distinct and independent event; and that the defendant intended to commit the alleged Rape. The definition of Rape shall be defined to you later in this charge. "Intentionally" means that the person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result.
>
> . . . .

Any person who commits the offense of rape is guilty of a crime. For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt the existence of the following essential elements: that the defendant had unlawful sexual penetration of the alleged victim or the alleged victim had unlawful sexual penetration of the defendant; and that force or coercion was used to accomplish the act; or that the sexual penetration was accomplished without the consent of the alleged victim and the defendant knew, or had reason to know, at the time of the penetration that the alleged victim did not consent; or that the defendant accomplished sexual penetration by fraud; and that the defendant acted either intentionally, knowingly or recklessly.

The trial court correctly instructed the jury that in order to be convicted of felony murder, the Defendant must have "intended to commit the alleged rape." The trial court then defined "intentionally" before setting forth the elements of rape. There is no culpable mental state required for felony murder, other than the intent to commit the underlying felony. See Tenn. Code Ann. § 39-13-202(b). "Intentional" is the highest, most demanding mental state and encompasses both "knowing" and "reckless." See Tenn. Code Ann. § 39-11-301(a)(2). Thus, the jury was, in essence, instructed that it must be the Defendant's "conscious objective or desire" to commit the rape in order to be convicted of felony murder. The trial court did not err in failing to define "knowingly" and recklessly" as a part of the mens rea of the underlying felony of rape.

## IX. Constitutionality of Tennessee Death Penalty Scheme

The Defendant raises several challenges to the constitutionality of Tennessee's death penalty provisions, though he "acknowledges that the majority of the issues raised herein have been adversely decided by the Tennessee Supreme Court." The Defendant contends that the Tennessee death penalty statutes and the imposition of the statutes violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution, and Article XI, Section 8, of the Tennessee Constitution. Specifically, the Defendant contends the following:

A. Tennessee's death penalty statutes fail to meaningfully narrow the class of death eligible defendants. Specifically, the statutory aggravating circumstance set forth in Tennessee Code Annotated sections 39-2-203(i)(2), (i)(5), (i)(6), and (i)(7) have been so broadly interpreted whether viewed singly or collectively, that they fail to provide a meaningful basis for narrowing the population of those convicted of first-degree murder to those eligible for the sentence of death. We note that factor (i)(6) does not pertain to this case as it was neither relied upon by the State nor found by the jury. Thus, any individual claim with respect to this factor is without merit. See, e.g., Hall, 958 S.W.2d at 715; State v. Brimmer, 876 S.W.2d 75, 87 (Tenn.), *cert. denied*, 513 U.S. 1020 (1994). Moreover, the Defendant's argument has been rejected by the Tennessee Supreme Court. See Vann, 976 S.W.2d at 117-118 (Appendix); State v. Keen, 926 S.W.2d 727, 742 (Tenn. 1994).

B. The death sentence is imposed capriciously and arbitrarily in that

(1) Unlimited discretion is vested in the prosecutor as to whether or not to seek the

-34-

death penalty. This argument has been rejected. See State v. Hines, 919 S.W.2d 573, 582 (Tenn. 1995), *cert. denied* 519 U.S. 847 (1996).

(2) The death penalty is imposed in a discriminatory manner based upon race, geography, and gender. This argument has been rejected. See Hines, 919 S.W.2d at 582; Brimmer, 876 S.W.2d at 87; State v. Cazes, 875 S.W.2d 253, 268 (Tenn. 1994), *cert. denied* 513 U.S. 1086 (1995).

(3) Requiring the jury to agree unanimously to a life verdict violates Mills v. Maryland and McKoy v. North Carolina. This argument has been rejected. See Brimmer, 876 S.W.2d at 87; State v. Thompson, 768 S.W.2d 239, 250 (Tenn. 1989); State v. King, 718 S.W.2d 241, 249 (Tenn. 1986), *superseded by statute as recognized by* State v. Hutchinson, 898 S.W.2d 161 (Tenn. 1994).

(4) There is a reasonable likelihood that jurors believe they must unanimously agree as to the existence of mitigating circumstances because of the failure to instruct the jury on the meaning and function of mitigating circumstances. This argument has been rejected. See Thompson, 768 S.W.2d at 251-52.

C. The appellate review process in death penalty cases, including comparative proportionality review, is constitutionally inadequate because the appellate court cannot reweigh proof due to the absence of written findings concerning mitigating circumstances, the information relied upon by the appellate court for comparative review is inadequate and incomplete, and the appellate court's methodology is flawed. This argument has been rejected. See Cazes, 875 S.W.2d at 270-71; Harris, 839 S.W.2d at 77. Moreover, the Tennessee Supreme Court has held that, "while important as an additional safeguard against arbitrary or capricious sentencing, comparative proportionality review is not constitutionally required." State v. Bland, 958 S.W.2d 651, 663 (Tenn. 1997), *cert. denied* 523 U.S. 1083 (1998); see Pulley v. Harris, 465 U.S. 36, 50-51 (1984) ("There is . . . no basis in our cases for holding that comparative proportionality review by an appellate court is required in every case in which the death penalty is imposed and the defendant requests it.")

## X. Indictment Failed to Charge Capital Offense

The Defendant contends that the imposition of the death penalty in this case violated due process of law because the indictment failed to set forth the aggravating circumstances. Relying upon the United States Supreme Court's decisions in Jones v. United States, 526 U.S. 227 (1999), Apprendi v. New Jersey, 530 U.S. 466 (2000), and Ring v. Arizona, 536 U.S. 584 (2002), the Defendant states that "[a]ny fact that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt in order to satisfy the Fifth Amendment's Due Process Clause and the Sixth Amendment's notice and jury trial guarantees." The Tennessee Supreme Court recently rejected this argument, stating, "[n]either the United States Constitution nor the Tennessee Constitution requires that the State charge in the indictment the aggravating factors to be relied upon by the State during sentencing in a first-degree murder prosecution." State v. Dellinger, 79 S.W.3d 458, 467 (Tenn. 2002); see State v. Holton, 126

S.W.3d 845, 862-63 (Tenn. 2004).

In <u>Dellinger</u>, the Court explained that the capital sentencing scheme in Tennessee is consistent with <u>Apprendi</u> because: (1) the holding in <u>Apprendi</u> applies only to enhancement factors used to impose a sentence above the statutory maximum; (2) the death penalty is within the statutory range of punishment prescribed for first-degree murder by the Tennessee General Assembly; and (3) Tennessee's capital sentencing procedure requires both that a jury find statutory aggravating circumstances based upon proof beyond a reasonable doubt and that the aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt. <u>Dellinger</u>, 79 S.W.3d at 466-67. In <u>Holton</u>, the Court addressed whether the holding in <u>Dellinger</u> was correct in light of the United States Supreme Court's decision in <u>Ring</u>. The Tennessee Supreme Court held that "<u>Ring</u> does not stand for the broad proposition that aggravating circumstances must be charged in the indictment to satisfy constitutional standards. . . . Therefore, <u>Ring</u> provides no relief to the defendant and does not invalidate this Court's holding in <u>Dellinger</u>." <u>Holton</u>, 126 S.W.3d at 863 (citing <u>United States v. Bernard</u>, 299 F.3d 467, 488 (5th Cir. 2002); <u>Porter v. Crosby</u>, 840 So. 2d 981, 986 (Fla. 2003); <u>Terrell v. State</u>, 572 S.E.2d 595, 602 (Ga. 2002)); <u>see</u> <u>State v. Carter</u>, 114 S.W.3d 895, 910 n.4 (Tenn. 2003) (applying <u>Dellinger</u> to reject a claim that <u>Ring</u> requires aggravating circumstances be included in the indictment). Accordingly, the Defendant is not entitled to relief on this issue.

## XI. Aggravating Circumstance (i)(5)

The jury found that aggravating circumstance (i)(5) applied when it imposed the sentence of death upon the Defendant. Tennessee Code Annotated section 39-13-204(i)(5) states that:

> No death penalty or sentence of imprisonment for life without possibility of parole shall be imposed but upon a unanimous finding that the state has proven beyond a reasonable doubt the existence of one (1) or more of the statutory aggravating circumstances, which are limited to the following: . . . (5) The murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death.

The Defendant contends that the evidence presented at trial is insufficient to justify a rational trier of fact in finding that this circumstance beyond a reasonable doubt. <u>See</u> Tenn. R. App. P. 13(e); <u>Jackson v. Virginia</u>, 443 U.S. 307, 324 (1979); <u>State v. Davidson</u>, 121 S.W.3d 600, 614 (Tenn. 2003). First, the Defendant states that the evidence failed to establish that the murder involved "serious physical abuse beyond that necessary to produce death" because, while the medical examiner determined that three of the stab wounds were fatal, he was unable to determine the order; thus, the State failed to establish that the thirteen non-fatal wounds were "beyond that necessary to produce death." Next, the Defendant contends that the State failed to rely upon "torture" at trial to prove this aggravating circumstance and it, therefore, cannot do so on appeal.

The State has the burden of proving beyond a reasonable doubt that a statutory aggravating circumstance exists. Tenn. Code Ann. § 39-13-204(i). In determining whether the evidence supporting the existence of an aggravating circumstance is sufficient, "the proper inquiry for the

appellate court is whether, after reviewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the aggravating circumstance beyond a reasonable doubt." State v. Carpenter, 69 S.W.3d 568, 574 (Tenn. Crim. App. 2001) (citing State v. Suttles, 30 S.W.3d 252, 262 (Tenn. 2000)).

Our Supreme Court discussed the (i)(5) aggravating circumstance and determined that "torture" had been defined as "the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious." State v. Odom, 928 S.W.2d 18, 26 (Tenn. 1996). The court also held that when the legislature added the words "or serious physical abuse," to the language, it intended "serious physical abuse" to be distinct from "torture." See id.; State v. Keen, 31 S.W.3d 196, 206 (Tenn. 2000). In examining the "serious physical abuse" element, the court determined that the word "serious" referred to the degree of abuse; that the abuse must be physical, as opposed to mental; and that "abuse" is properly defined as an "excessive" act, or one which makes "improper use of a thing," or which uses a thing "in a manner contrary to the natural or legal rules for its use." Id. (citing Black's Law Dictionary 11 (6th ed. 1990)).

Applying this definition to the facts in this case, we conclude that a rational trier of fact could have found the existence "serious physical abuse" beyond a reasonable doubt. The victim was stabbed a total of sixteen times. There were defensive type wounds on the victim's wrists. Three wounds to the neck area were "very serious," severing the exterior jugular vein, trachea, and esophagus. These wounds would have been fatal absent prompt medical attention. There were indications of ten stab wounds to the victim's torso. The Defendant's argument that the medical examiner's inability to determine the order in which the wounds were inflicted precludes a finding of "serious physical abuse" fails. Three wounds, each standing alone, were sufficient to result in death. Thus, the additional stabbings alone establish "serious physical abuse" as contemplated by the Legislature. Further, the multiple stabbings of the victim support the jury's finding of the (i)(5) aggravating circumstance. This claim is without merit.

## XII. Aggravating Circumstance (i)(7)

The jury also found that aggravating circumstance (i)(7) applied when it sentenced the Defendant to death. This Code section states that:

> No death penalty or sentence of imprisonment for life without possibility of parole shall be imposed but upon a unanimous finding that the state has proven beyond a reasonable doubt the existence of one (1) or more of the statutory aggravating circumstances, which are limited to the following: . . . (7) The murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, any first-degree murder, arson, rape . . . .

Tenn. Code Ann. § 39-13-204(i)(7). The Defendant contends that the evidence is insufficient to support the finding of this aggravating circumstance. The Defendant asserts the same argument and

grounds to contend that the evidence is insufficient to support the jury's finding regarding the existence of this aggravating circumstance as he asserted to contest the sufficiency of the evidence to support his felony murder conviction based upon rape. In essence, he again contends that the evidence is insufficient to prove that he raped the victim. Having previously held that the evidence was sufficient to support the jury's finding that the Defendant raped the victim, and having throughly discussed that holding in section II of this opinion, we conclude that, in accordance with our previously-articulated reasoning, the evidence is sufficient for a rational trier of fact to find that this aggravating circumstance existed beyond a reasonable doubt. This issue is without merit.

## XIII. Aggravating Circumstance (i)(2)

The jury found that aggravating circumstance (i)(2) applied when it imposed the sentence of death upon the Defendant. Tennessee Code Annotated section 39-13-204(i)(2) states that:

> No death penalty or sentence of imprisonment for life without possibility of parole shall be imposed but upon a unanimous finding that the state has proven beyond a reasonable doubt the existence of one (1) or more of the statutory aggravating circumstances, which are limited to the following: . . . (2) The defendant was previously convicted of one (1) or more felonies; other than the present charge, whose statutory elements involve the use of violence to the person.

Proof was presented that the Defendant had previously been convicted of aggravated assault on January 2, 1991, and the trial court instructed the jury that aggravated assault "is a felony involving the use of violence to the person" for purposes of aggravating circumstance (i)(2). The Defendant contends that: (1) the evidence in insufficient to support the jury's finding that this aggravating circumstance was applicable; and (2) that it is unconstitutional for the trial court to determine whether the underlying felony, aggravated assault, was a felony involving the use of violence to the person.

## A. Sufficiency of the Evidence of Aggravating Circumstance (i)(2)

The Defendant contends, and the State concedes, that there is insufficient evidence in the record to show that the trial court properly determined that the Defendant's previous felony conviction for aggravated assault was one that involved the use of violence to the person. We agree. Our supreme court has recognized that some felony offenses, specifically aggravated assault, do not necessarily involve the use of violence. State v. Powers, 101 S.W.3d 383,400 (Tenn. 2003); State v. Sims, 45 S.W.2d 1, 11-12 (Tenn. 2001). Therefore, in Sims, the Court approved a procedure in which the trial judge, outside the presence of the jury, considers the underlying facts of the prior assault to determine whether the elements of those offenses involved the use of violence to the person. Powers, 101 S.W.3d at 400; Sims, 45 S.W.3d at 11-12. If the trial court determines that the statutory elements of the prior offense involved the use of violence the State may introduce evidence that the defendant had previously been convicted of the prior offenses. Powers, 101 S.W.3d at 400-401. The trial court then would instruct the jury that those convictions involved the use of violence to the person. Id. The trial court in this case did not follow this procedure. No determination was

made as to whether the elements of the offense involved the use of violence to the person nor was any evidence presented to the court or the jury regarding the underlying facts of this offense. Accordingly, there is no proof in the record before us to support a finding that the Defendant's prior conviction for aggravated assault involved the use of violence to the person.

## B. Trial Court's Instruction Regarding Aggravated Circumstance (i)(2)

The Defendant contends that the trial court's instruction to the jury that his previous felony, aggravated assault, was one that involved the use of violence to the person is constitutionally impermissible. The crux of the Defendant's argument is this: The United States Supreme Court has held that the determination of whether a defendant has a prior conviction may be determined by a trial judge, see Apprendi v. New Jersey, 530 U.S. 466, 490 (2000), but all aggravating circumstances used that must be proved beyond a reasonable doubt must be determined by a jury, see Ring v. Arizona, 536 U.S. 584 (2002). The Tennessee Supreme Court has held that for purposes of determining whether a defendant has a conviction for a prior violent felony involving the use of violence against a person, for purposes of aggravating circumstance (i)(2), the trial judge must "necessarily examine the facts underlying the prior felony" to determine whether it involved violence against a person if that prior violent felony conviction may be committed with or without proof of violence. See State v. McKinney, 74 S.W.3d 291, 306 (Tenn. 2002); Sims, 45 S.W.2d at 11-12 . Accordingly, the Defendant contends, the trial judge makes the determination, beyond a reasonable doubt, about this aggravating circumstance, not the jury, and this determination by the trial judge violates the precedence set forth in Ring. Prior to conducting our analysis on this issue, we note that the trial in the case under submission occurred six months before the Ring decision.

A panel of this Court recently addressed this identical issue in State v. Detrick Cole, No. W2002-01254-CCA-R3-DD, 2003 WL 22848969, at *14-16 (Tenn. Crim. App., at Jackson, Nov. 24, 2003). In Cole, this Court acknowledged both the dictates of our supreme court established in Sims and the implications of the United States Supreme Court's decision in Ring. After a thorough dissertation of the applicable law, this Court noted in Cole several areas left undecided by the United States Supreme Court. Additionally, this Court, in light of the Ring decision, questioned our supreme court's decision as to whether Tennessee has a blanket exemption from the right to trial by jury requirements of Apprendi and Ring based solely on the fact that we have jury sentencing in capital cases.[6] State v. Detrick Cole, 2003 WL 22848969, at *14-16.

This Court evaluated the implications of Ring and Apprendi as applied to the (i)(2) aggravating circumstance, stating:

> Apprendi requires that any "fact" which increased the penalty beyond the prescribed statutory maximum, "*other than the fact of a prior conviction*," must be submitted to a jury and found beyond a reasonable doubt. 530 U.S. at 490 (emphasis added).

---

[6]Our supreme court affirmed its decision in Dellinger on January 5, 2004. See State v. Holton, 126 S.W.3d 845, (Tenn. 2004). However, the Supreme Court was not presented with the issue regarding the apparent conflict between the Sims decision and Ring and, thus, is not dispositive of the issue before this Court

Further, Ring dictates that the death penalty is a penalty beyond the prescribed statutory maximum. 536 U.S. at 603-04. In regard to Tennessee's prior violent felony aggravating circumstance, Sims authorizes the examination of the underlying facts in order to determine whether the prior felonies were or were not, in fact, violent. 45 S.W.3d at 11-12. When a trial judge examines the underlying facts, factually determines that a prior offense involved violence, and then, based upon its finding of fact, instructs the jury as a matter of law that the prior violent felony involved violence, it is arguable that this usurps the role of the jury as trier of fact. Therefore, it is arguable the procedure outlined in Sims may well be in violation of Ring.

State v. Detrick Cole, 2003 WL 22848969, at *15. Acknowledging that the automatic review of capital cases by the Tennessee Supreme Court, Tenn. Code Ann. § 39-13-206(a)(1), pretermitted the necessity of determining whether the procedure set forth in Sims violates the holding of Ring, this Court proceeded to hold that the error incurred as a result of following the Sims procedure, if error at all, was harmless in light of the fact that the jury was presented with evidence underlying the defendant's prior convictions. Id.

In the case presently before us, the trial court determined that the Defendant's previous felony was one involving the use of violence against the person. There is no evidence in the record regarding the circumstances of the Defendant's previous felony conviction. Accordingly, under either Sims or Ring, the application of the (i)(2) aggravating circumstance in this case is error.

Errors affecting the jury's consideration of an invalid aggravating circumstance in a capital sentencing proceeding must result in reversal unless the reviewing court concludes that the error was harmless beyond a reasonable doubt. See, e.g., State v. Howell, 868 S.W.2d 238, 259 (Tenn. 1993). The error is harmless only where the reviewing court concludes beyond a reasonable doubt that the sentence would have been the same had the jury not considered the improper evidence in aggravation. See id. at 262. This holding was premised upon decisions of the United States Supreme Court which had directed that if a jury considers an invalid or improper aggravating circumstance, either "constitutional harmless error analysis or reweighing at the trial or appellate level suffices to guarantee that the defendant received an individualized sentence." Stringer v. Black, 503 U.S. 222, 232 (1992); Richmond v. Lewis, 506 U.S. 40 (1992); Clemons v. Mississippi, 494 U.S. 738 (1990). The Supreme Court set forth factors to consider in determining whether application of an inappropriate aggravating circumstance was harmless error: "(1) the number and strength of remaining valid aggravating circumstances; (2) the prosecutor's argument at sentencing; (3) the evidence admitted to establish the invalid aggravator; and (4) the nature, quality, and strength of the mitigating evidence." Id. at 261. In applying these factors, the Court recognized that "more crucial than the sum of the remaining aggravating circumstances is the qualitative nature of each circumstance, its substance and persuasiveness, as well as the quantum of proof supporting it." Id.

In the case under submission, the other valid aggravating factors were that the murder was committed while the defendant had a substantial role in committing or attempting to commit a rape, (i)(7), and that the murder was especially heinous, atrocious, or cruel, (i)(5). The evidence

supporting the (i)(5) aggravator was uncontroverted. The thirteen-year-old victim was viciously stabbed a total of sixteen times. She was stabbed in the neck, head, chest, and she suffered defensive type wounds. Three of the sixteen wounds were deemed fatal absent immediate medical attention. The thirteen-year-old victim was then left in the wooded area to die. The evidence further established that the victim's shorts and underwear were around her ankles. The medical examiner testified that the advanced decomposition to the vaginal area was indicative of trauma to that area. Furthermore, the Defendant acknowledged that he had "consensual" intercourse with the victim earlier that day at his stepfather's house. The Defendant's stepfather rebutted the claim that the Defendant and the victim had any type of sexual encounter at the stepfather's house.

The only evidence introduced to establish the aggravating circumstance (i)(2), which we have found was improperly applied, was the judgment form of the Defendant's previous aggravated assault conviction and the waiver of trial form. In mitigation, the Defendant presented testimony that he had a low I.Q., used drugs, and, at age sixteen, witnessed an armed robbery during which someone was killed. During closing argument, the prosecution focused on the heinous, atrocious, cruel factor, the number of wounds inflicted upon the victim, and the circumstances surrounding the murder. The prosecutor made only brief references to the (i)(2) aggravator saying: (1) "there is proof, as you heard from the clerks, of a . . . felony conviction - involving violence to the person. . .;" (2) " [w]e are talking about a person who, in 1991, was convicted of a crime of violence;" (3) "[w]hat did [the Defendant] learn after he was convicted of aggravated assault, which is a crime involving violence;" and (4) "[l]et's talk first about the conviction in 1991. Taken by itself, the fact that he was convicted of a crime in 1991, it means nothing. But when you add the fact that it was a crime of violence, of aggravated assault, on another person; and you see in 1991 he was convicted of it; in the year 2000, he's not only older, he's doing worse." Finally, we note that no materially inaccurate or inadmissible evidence was admitted to establish the invalid aggravating circumstance.

The evidence of the mitigating factors was clearly outweighed by the strength of the remaining two aggravating circumstances. In sum, we conclude that the Defendant's sentence would have been the same had the jury given no weight to the prior violent felony aggravating circumstance. Thus, the jury's consideration of the invalid aggravator was harmless error. The remaining aggravating circumstances were supported by more than sufficient proof, the invalid aggravating circumstance was not emphasized by the prosecution during closing argument, and the mitigation proof offered was weak in comparison to the strength of the aggravating proof. Therefore, this issue is without merit.

## XIV. Review Pursuant to Tennessee Code Annotated section 39-13-206(c)

For a reviewing court to affirm the imposition of a death sentence, Tennessee Code Annotated section 39-13-206(c)(1) requires a determination that:

(1) the sentence was not imposed in an arbitrary fashion;
(2) the evidence supports the jury's finding of statutory aggravating circumstance(s);
(3) the evidence supports the jury's finding that the aggravating circumstances outweigh any mitigating circumstances; and

-41-

(4) the sentence is not excessive or disproportionate to the penalty imposed in similar cases.

The sentencing phase in the present case was conducted pursuant to the procedure established in the applicable statutory provisions and rules of criminal procedure. We conclude that the sentence of death, therefore, was not imposed in an arbitrary fashion. Moreover, the evidence indisputably supports aggravating circumstances (i)(5), that the murder was especially heinous, atrocious, or cruel, and (i)(7), that the murder was knowingly committed during a felony.

Additionally, this Court is required by Tennessee Code Annotated section 39-13-206(c)(1)(D), and under the mandates of Bland, 958 S.W.2d at 661-74, to consider whether the Defendant's sentence of death is disproportionate to the penalty imposed in similar cases. See State v. Godsey, 60 S.W.3d 759, 781-82 (Tenn. 2001). The comparative proportionality review is designed to identify aberrant, arbitrary, or capricious sentencing by determining whether the death penalty in a given case is "disproportionate to the punishment imposed on others convicted of the same crime." Stout, 46 S.W.3d at 706 (citing Bland, 958 S.W.2d at 662 (quoting Pulley, 465 U.S. at 42-43). "If a case is 'plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed,' then the sentence is disproportionate." Stout, 46 S.W.3d at 706 (quoting Bland, 958 S.W.2d at 662).

In conducting our proportionality review, this Court must compare the present case with cases involving similar defendants and similar crimes. See Stout, 46 S.W.3d at 706 (citing Bland, 958 S.W.2d at 667); see also Terry v. State, 46 S.W.3d 147, 163 (Tenn. 2001). We select only from those cases in which a capital sentencing hearing was actually conducted to determine whether the sentence should be life imprisonment, life imprisonment without the possibility of parole, or death. See State v. Carruthers, 35 S.W.3d 516, 570 (Tenn. 2000), cert. denied, 533 U.S. 953 (2001) (citations omitted); see also Godsey, 60 S.W.3d at 783. We begin with the presumption that the sentence of death is proportionate with the crime of first-degree murder. See Terry, 46 S.W.3d at 163 (citing State v. Hall, 958 S.W.2d 679, 799 (Tenn.), cert. denied, 524 U.S. 941 (1998)). This presumption applies only if the sentencing procedures focus discretion on the "'particularized nature of the crime and the particularized characteristics of the individual defendant.'" Terry, 46 S.W.3d at 163 (quoting McCleskey v. Kemp, 481 U.S. 279, 308 (1987)).

Applying this approach, the Court, in comparing this case to other cases in which the defendants were convicted of the same or similar crimes, looks at the facts and circumstances of the crime, the characteristics of the defendant, and the aggravating and mitigating factors involved. See Terry, 46 S.W.3d at 164. Regarding the circumstances of the crime itself, numerous factors are considered, including: (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the victim's age, physical condition, and psychological condition; (6) the absence or presence of provocation; (7) the absence or presence of premeditation; (8) the absence or presence of justification; and (9) the injury to and effect on non-decedent victims. Stout, 46 S.W.3d at 706 (citing Bland, 958 S.W.2d at 667); see also Terry, 46 S.W.3d at 164. Contemplated within the review are numerous factors regarding the defendant, including: (1) prior criminal record; (2) age, race, and gender; (3) mental, emotional, and physical condition; (4) role in

the murder; (5) cooperation with authorities; (6) level of remorse; (7) knowledge of the victim's helplessness; and (8) potential for rehabilitation. Stout, 46 S.W.3d at 706; Terry, 46 S.W.3d at 164.

In completing our review, we remain cognizant of the fact that "no two cases involve identical circumstances." Terry, 46 S.W.3d at 164. Accordingly, there is no mathematical or scientific formula to be employed. Thus, our function is not to limit our comparison to those cases where a death sentence "is perfectly symmetrical," but rather, our objective is only to "identify and to invalidate the aberrant death sentence." Terry, 46 S.W.3d at 164 (citing Bland, 958 S.W.2d at 665).

The circumstances surrounding the murder in light of the relevant and comparative factors reveal that the Defendant directed the victim, his stepdaughter, to a secluded wooded area behind the Amoco station on Chelsea Street. In the woods, the victim was brutally stabbed sixteen times, by either the Defendant or by his nephew, Mario Rice. Evidence existed revealing that the victim had been raped at some point. Defendant Rice also admitted that the victim's murder was planned in an effort to hurt his estranged wife, the victim's mother.

The evidence showed that the Defendant had an I.Q. of 79 and was generally a poor student. The Defendant has an eighth grade education at best. At age sixteen, the Defendant witnessed an aggravated robbery, during which a person was killed. Of the Defendant's five siblings, only two are alive. Testimony also established that the Defendant used crack cocaine and other drugs.

The death penalty has been upheld where the victim was a young child: In State v. Keen, 31 S.W.3d 196 (Tenn. 2000), the defendant was convicted of first degree murder during the perpetration of a rape of his girlfriend's eight-year-old daughter. The jury applied two aggravating circumstances, including the young age of the victim and the fact that the murder was especially heinous, atrocious, or cruel. Id. at 205. The evidence established that the defendant raped the child while choking her, possibly with a shoelace. Id. at 203-04. The defendant demonstrated remorse after the offense and had no prior criminal record. Id. at 205.

In State v. Vann, 976 S.W.2d 93 (Tenn. 1998), the defendant was convicted of felony murder during the perpetration of a rape of his eight-year-old daughter. The proof indicated that the victim's death was the result of ligature strangulation. Id. at 97. The jury applied three aggravating circumstances in sentencing the defendant to death: (1) the young age of the victim; (2) the defendant's prior convictions for aggravated rape; and (3) the fact that the murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. Id. at 100; see Tenn. Code Ann. § 39-13-204(i)(1), (2), (5) (1997). Medical testimony indicated that the condition of the victim's anus was consistent with ongoing, repeated anal penetration. Vann, 976 S.W.2d at 97. Witnesses testified that the defendant showed no remorse at the hospital about his daughter's death, and nothing in the record indicated a capacity for rehabilitation. Id.

In State v. Irick, 762 S.W.2d 121 (Tenn. 1988), the twenty-six-year-old defendant was convicted of first degree felony murder and two counts of aggravated rape. In Irick, the defendant

was babysitting a friend's children, including the victim. Id. at 133. The defendant raped the seven-year-old victim vaginally and anally. Id. at 134. The victim suffocated as the defendant held his hand over her mouth to keep her from screaming as he raped her. Id. Following a sentencing hearing, the jury found four aggravating circumstances: (1) the victim was less than twelve years of age; (2) the murder was especially heinous, atrocious or cruel in that it involved torture or depravity of mind; (3) the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another; and (4) the murder was committed during the perpetration of a felony. Id. at 124; see Tenn. Code Ann. § 39-2-203(I)(1), (5), (6), (7). The defendant had offered mitigating evidence that he had been under the influence of marijuana or alcohol at the time he committed the offense and that he had a past mental impairment. Irick, 762 S.W.2d at 134.

In State v. Coe, 655 S.W.2d 903 (Tenn. 1983), the defendant was a stranger to the eight-year-old victim. He lured her into his car, drove to an isolated spot, and raped her. Id. at 905-06. When Coe completed the rape, the victim told him that Jesus loved him. Id. at 906. At that point, the defendant strangled the victim until she turned blue. Id. When the victim did not immediately die from the strangulation, he stabbed her in the neck with a pocket knife and watched as she suffered agonizing death throes. Id. Eventually, he left her to die in the wooded area. Id. Coe was convicted of first-degree murder, kidnapping, and aggravated rape. Id. at 905. Following the sentencing hearing, the jury sentenced the defendant to death upon finding four aggravating circumstances: (1) the victim was not twelve years of age; (2) the murder was especially heinous, atrocious or cruel in that it involved torture or depravity of mind; (3) the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another; and (4) the murder was committed while the defendant was engaged in committing or attempting to commit rape. Id.; see Tenn. Code Ann. § 39- 2-203(i)(1), (5),(6), (7). As mitigating evidence, the defendant claimed that he had been under the influence of extreme mental or emotional disturbance at the time he committed the offense. Coe, 655 S.W.2d at 908.

In State v. Payne, 791 S.W.2d 10 (Tenn. 1990), the twenty-year-old defendant was convicted of two counts of first degree murder. The defendant stabbed to death his girlfriend's twenty-eight-year-old neighbor and the neighbor's two-year-old daughter. Id. at 12. The jury imposed the death penalty for each conviction upon finding four aggravating circumstances: (1) one of the victims was less than twelve years old; (2) the defendant knowingly created a great risk of death to two or more persons other than the victim; and (3) the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind. Id. at 19-20; see Tenn. Code Ann. § 39-2-203(i)(1), (3), (5).

The death penalty has been imposed upon finding of the (i)(5) and/or the (i)(7) aggravating factors and where the victim or victims had been stabbed. See e.g., State v. West, 767 S.W.2d 387 (Tenn. 1998) (imposing the death penalty where defendant separated mother and daughter, restrained the victims, and stabbed one victim seventeen times and the other victim numerous times, upon finding of aggravating circumstances (i)(5) and (i)(7)); State v. Bush, 942 S.W2d 489 (Tenn. 1997) (imposing the death penalty where the defendant murdered a 79 year- old widow upon finding aggravating circumstance (i)(5), despite substantial mitigation proof); State v. Harris, 839 S.W.2d 54 (Tenn. 1992) (imposing death penalty for murders of two victims, where victims had been both

shot and stabbed, but fatal wound as to one victim was a deep cut to the throat that cut the trachea and major blood vessels and chipped the spinal column); State v. Payne, 791 S.W.2d 10 (Tenn. 1990) (imposing death penalty for stabbing two victims, where one victim was stabbed forty-one times and the second was stabbed nine times upon finding aggravating circumstances (i)(3) and (i)(5)); State v. Jones, 789 S.W.2d 545 (Tenn. 1990) (imposing death penalty where a thirty-eight-year-old murdered the victim who was stabbed six times after being bound, gagged and blindfolded, upon finding of (i)(2), (i)(5), and (i)(6) aggravating circumstances); State v. Thompson, 768 S.W.2d 239 (Tenn. 1989) (imposing death penalty where female victim was taken to a remote location and stabbed repeatedly, upon finding aggravating circumstances (i)(5), (i)(6), and (i)(7)); and the companion cases of State v. Dicks, 615 S.W.2d 126 (Tenn. 1981) and State v. Strouth, 620 S.W.2d 467 (Tenn. 1981) (imposing death penalty where co-defendants robbed a store and slit the throat of elderly man who bled to death, upon finding aggravating circumstances (i)(5) and (i)(7)).

While no two capital cases are identical, we have compared the circumstances of the present case with the circumstances of the cases set out above and others not herein detailed, and we conclude that this case, taken as a whole, is not plainly lacking in circumstances consistent with other similar cases in which the death penalty has been imposed. Thus, the Defendant's sentence of death is not disproportionate considering the circumstances of the crime and the defendant. In so concluding, we have considered the entire record and reach the decision that the sentence of death was not imposed arbitrarily, that the evidence supports the finding of the (i)(5) and (i)(7) aggravators, that the evidence supports the jury's finding that the aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt, and that the sentence is not excessive or disproportionate.

## XV.  Conclusion

Having fully reviewed the record, the briefs, and the applicable authority, we AFFIRM the Defendant's conviction for first degree murder. Additionally, in accordance with the mandate of Tennessee Code Annotated section 39-13-206(c)(1), and the principles adopted in prior decisions of the Tennessee Supreme Court, we have considered the entire record in this cause and conclude the sentence of death was not imposed in any arbitrary fashion, that the evidence supports, as previously discussed, the jury's finding of the statutory aggravating circumstances, and that the jury's finding that the aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt. Tenn. Code Ann. § 39-13-206(c)(1)(A)(C). A comparative proportionality review, considering both "the nature of the crime and the defendant," convinces us that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases. Accordingly, we AFFIRM the sentence of death imposed by the trial court.

_____
JUDGE ROBERT W. WEDEMEYER